## BALTIMORE & OHIO RAILROAD CO. ET AL. v. UNITED STATES ET AL.

No. 642.   Argued January 9–10, 1967.—Decided March 27, 1967.*

---

*Together with No. 680, *Delaware & Hudson Railroad Corp.* v. *United States et al.,* No. 691, *Erie-Lackawanna Railroad Co.* v. *United States et al.,* No. 813, *City of Scranton et al.* v. *United States et al.,* No. 814, *Shapp* v. *United States et al.,* and No. 815, *Chicago & Eastern Illinois Railroad Co.* v. *United States et al.,* also on appeal from the same court.

*Howard J. Trienens, Lloyd N. Cutler, Edward W. Bourne, Harry G. Silleck, Jr., Leon H. Keyserling* and *Gordon P. MacDougall* argued the cause for appellants in all cases. With *Messrs. Trienens* and *Cutler* on the brief for appellant Baltimore & Ohio Railroad Co. in No. 642 were *George L. Saunders, Jr.,* and *Edward K. Wheeler.* With *Mr. Cutler* on the brief for appellant Central Railroad Co. of New Jersey in No. 642 was *Richard B. Wachenfeld.* With *Mr. Bourne* on the brief for appellant Erie-Lackawanna Railroad Co. in No. 691 were *J. Kenneth Campbell* and *John T. Rafferty.* *Mr. Silleck* also filed briefs for appellant in No. 680, and *Messrs. MacDougall* and *Keyserling* for appellants in Nos. 813 and 814. *Frank F. Vesper, Patrick C. Mullen* and *James H. Durkin* were on the briefs for appellant in No. 815.

*Solicitor General Marshall* argued the cause for the United States in all cases. With him on the brief were *Assistant Attorney General Turner, Louis F. Claiborne* and *Richard A. Posner. Robert W. Ginnane* argued the cause for appellee Interstate Commerce Commission in all cases. With him on the brief were *Fritz R. Kahn,*

*Arthur J. Cerra* and *Jerome Nelson.* *Hugh B. Cox,
Joseph Auerbach, Walter J. Myskowski, Samuel Kanell,*
Special Assistant Attorney General of Connecticut, *David
Berman,* Assistant Attorney General of Massachusetts,
and *John H. Chafee,* Governor of Rhode Island, argued
the cause for the remaining appellees. With *Mr. Cox*
on the brief for appellee Pennsylvania Railroad Co. was
*Henry P. Sailer.* *Mr. Auerbach* also filed a brief for
appellees Smith et al., trustees of New York, New Haven
& Hartford Railroad Co. With *Mr. Myskowski* on the
brief for appellee State of New York were *Louis J. Lefko-
witz,* Attorney General, and *Dunton F. Tynan,* Assistant
Solicitor General. With *Governor Chafee* and *Messrs.
Kanell* and *Berman* on the brief for the State of Con-
necticut et al. were *Harold M. Mulvey,* Attorney General,
*F. Michael Ahern, David B. Beizer* and *Robert L. Hirtle,*
Assistant Attorneys General, and *William J. Lynch* for
the State of Connecticut; *Edward W. Brooke,* Attorney
General, and *Joseph L. Tauro,* Special Assistant Attor-
ney General, for the Commonwealth of Massachusetts;
and *J. Joseph Nugent,* Attorney General, and *Robert M.
Schacht,* Assistant Attorney General, for the State of
Rhode Island. *Donald L. Wallace* was on the brief for
appellees Greater Philadelphia Chamber of Commerce
et al. *Levy Anderson* was on the brief for appellee
City of Philadelphia.

*Edward Friedman,* Attorney General, and *Edward
Munce* and *Robert M. Harris,* Assistant Attorneys Gen-
eral, filed a brief for the Commonwealth of Pennsylvania,
as *amicus curiae,* urging affirmance in Nos. 642, 680
and 691.

MR. JUSTICE CLARK delivered the opinion of the Court.

These six appeals involve the validity of an order of
the Interstate Commerce Commission permitting the
merger of the Pennsylvania Railroad Company and the

New York Central Railroad Company (Penn-Central) pursuant to § 5 (2) of the Interstate Commerce Act, as amended, 41 Stat. 481, 49 U. S. C. § 5 (2). In its original order of April 6, 1966, the Commission found that the merger might divert a substantial amount of traffic from the Erie-Lackawanna Railroad Company (E–L), the Delaware and Hudson Railroad Company (D & H) and the Boston and Maine Corporation (B & M), three smaller competing carriers designated as the "protected railroads" by the Commission. These protected railroads had filed under § 5 (2)(d) of the Act applications for inclusion in both this merger and in *Norfolk & W. Ry. Co. and New York, C. & St. L. R. Co.—Merger,* 324 I. C. C. 1. In the latter case inclusion of E–L and D & H has been recommended and, together with B & M, is pending before the Commission. The applications of the protected roads in the *Penn-Central* proceeding have been held in abeyance pending decision in the *Norfolk* proceeding.

On the merits of the Penn-Central merger, the Commission found that the service the protected railroads "render their shippers is essential and the public interest dictates that [such service] be preserved." The Commission concluded "that immediate consummation of the proposed merger would be consistent with the public interest, if conditions are imposed to obviate impairment or serious weakening" of the three lines. Without such conditions or the inclusion of the protected roads in a major system, the Commission further found, it would be doubtful if the "three carriers could withstand the competition of the applicants merged, and, unless they are protected during the period necessary to determine their future, we would not authorize consummation at this time, even though approving the merger." 327 I. C. C. 475, 532. It, therefore, applied, *sua sponte,* certain conditions to the immediate consummation of the merger which were "designed to prevent any loss of revenue over the

three railroads [the protected railroads] as a direct result of immediate consummation of this merger." Its "approval of the merger for undelayed consummation" was made "subject . . . to the conditions specifically described in appendix G," *ibid.*, which was attached as an appendix to the April 6, 1966, order, and which we likewise attach as an Appendix here. The Commission, apparently because of the necessity for the conditions and the urgency of the merger, required compliance with Appendix G even though it had neither the benefit of a report from a Hearing Examiner thereon, nor the advantage of a hearing before the Commission itself. These conditions detailed the protection which must be given the protected railroads and made them a prerequisite to the consummation of the merger.

The Commission, therefore, not only found that protection of the three railroads was necessary, but fixed the terms thereof and required compliance prior to permitting the merger. There was nothing tentative about Appendix G. The conditions were divided into two general categories and provided that: (1) On traffic for which the protected railroads are "competitive factors" [1] the merged company shall not, pending final determination of the inclusion proceedings, provide any new or changed routing practice, freight rates, or service which would divert or tend to divert traffic from routes in which the protected railroads, or any of them, participate or participated at the time of the merger. And (2) the protected railroads would be indemnified by the merged company against revenue losses by reason of the merger. Appendix G to the order detailed the manner in which

---

[1] "Competitive factor" was defined as any particular route, rate, or service on which any of the "protected railroads" were handling traffic at the time the merger application was filed or at the date of the order.

such indemnity would be calculated and provided for the accelerated processing of complaints as to new or changed routes, practices, rates, or services. Section 7 of Appendix G provided that if the merged company did not accede to all of the conditions, the merger would be deferred for two years or "such time as the Commission may determine to be necessary to protect the interests of D & H, B & M and E–L." And § 8 provided that the conditions "shall be construed, administered and enforced with the view to protecting the E–L, D & H and B & M and the shipping public which depends upon them for transportation, against the effects of the merger for the period and purposes set forth above."

Thereafter, and without a hearing, but apparently on the objection of most of the parties, the Commission on September 16, 1966, modified its April 6 order and reopened the hearing. 328 I. C. C. 304. The objectors, among other things, pointed to the fact that the conditions of Appendix G were made without any notice or hearing and would create irreconcilable conflicts between the protected carriers and others adversely affected by the merger. In reopening the hearing the Commission limited it to the conditions imposed in Appendix G; the prevention of possible manipulation of such conditions and the enlargement of the indemnity provision to include capital loss. In the reopening order of September 16, 1966, the Commission left intact its order of April 6, 1966, as to the undelayed consummation of the merger, continued in effect the ban on new or changed routes, practices, and rates as to traffic in which any of the protected railroads participated, but lifted the indemnification condition until further order, at which time any such provision found necessary could be made retroactive to the date of the merger. None of the previous findings, as to the necessity for the immediate imposition of the conditions included in the original order, were

amended or withdrawn. The traffic conditions alone were left in effect.

This suit was filed on September 7, 1966, and arose upon the complaint of E–L and other railroads seeking an interlocutory injunction to restrain the consummation of the merger. A three-judge court was convened, 28 U. S. C. § 2284, and thereafter it declined, by a divided vote, to grant the interlocutory injunction. *Erie-Lackawanna Railroad Co.* v. *United States,* 259 F. Supp. 964. The appellants sought a stay from MR. JUSTICE HARLAN who referred the application to the Court and it was granted on October 18, 1966. At the same time we expedited the case for consideration. 385 U. S. 914. The sole question before us is whether, in light of the findings as to the necessity for interim protection for the so-called protected railroads, the Commission erred in permitting the consummation of the merger prior to and without awaiting determination of the inclusion proceedings. We believe that the Commission erred in approving the immediate consummation of the merger without determining the ultimate fate of the protected roads. We, therefore, reverse the judgment and remand the case to the District Court with instructions to remand the matter to the Commission for further proceedings in accordance with this opinion.

I.

*Questions not here decided.*

At the outset we make it clear that we do not pass on the validity of the merger, the special conditions of Appendix G, the modified order of the Commission, or the peripheral points posed by the various parties. We hold only that under the uncontradicted findings of the Commission it was necessary for it to conclude the inclusion proceedings, as to the protected railroads, prior to permitting consummation of the merger.

## II.

*The merger, its background, its participants and relative position.*

The Penn-Central merger has been under study and discussion by the Commission for some 10 years. After the initial study was completed in 1959, Central withdrew from the plan and began negotiations for a merger with the Chesapeake and Ohio Railway Company (C & O) for joint control of the Baltimore and Ohio Railroad Company (B & O). However, when at a later date C & O had contracted for the purchase of some 61% of B & O stock, Central gave up its plan and renewed negotiations with Penn. The two roads signed an agreement of merger in 1962. The New York, New Haven and Hartford Railroad Company (NH) approached Penn and Central for inclusion in the plan but was given a deaf ear. The merger agreement provided that all properties, franchises, etc. (permitted by respective state law), would be transferred to the merged company and appropriate stock exchange, debt arrangements, etc., effected.

As the Commission found, the merger would "create an hour-glass shaped system flared on the east from Montreal, Canada, through Boston, Mass., to Norfolk, Va., and on the west from Mackinaw City, Mich., through Chicago, Ill., to St. Louis, Mo." 327 I. C. C., at 489. It would operate some 19,600 miles of road in 14 States between the Great Lakes, with a splash in Canada on the north, and the Ohio and Potomac Rivers on the south. After the two systems are connected as planned and new and expanded yards are provided, the merger will consolidate trains now moving separately between the same points. The combined systems will have a substantial amount of parallel trackage and routes, with 160 common points or junctions. Terminals will be consolidated, present interchanges be-

tween the two systems will be eliminated and only the most efficient yards and facilities of the respective systems will be utilized. The merger plan calls for 98 projects that will intermesh their long-haul traffic at key points, creating a nonstop service between the principal cities with "locals" covering the multiple-stop routes and branch lines. It is estimated that enormous savings in transit time can be effected. Certain chosen yards—such as Selkirk—will be remodeled and modernized into electronically operated yards with capacities of from 5,000 to 10,000 cars per day. The through trains to the West will be formed at Selkirk and those from the West broken up for dispatch to terminals or consignees in New England, New York, and northern New Jersey. The plan calls for some New York City traffic to be routed over Central's Hudson River East Shore line to lessen cost. By consolidating traffic on fast through lines, filling out trains, re-routing over the most efficient routes, eliminating some interchanges and effecting other improvements, the merged company will reduce by 6,000,000 the number of train miles operated. A single-line service will be operated between more points, with less circuity and less switching. The plan also calls for 31 daily trains to be withdrawn from the Pennsylvania with seven new ones added, leaving a total of 319 trains daily.

The Pennsylvania is the largest and Central the third largest railroad in the Northeastern Region. Together the operating revenue of the two roads was over $1,500,000,000 in 1965. Their net income in 1964 totaled almost $57,000,000 and in 1965 ran in excess of $75,000,000. In 1963 the total net was barely $16,000,000. The cost of operation of the two systems runs $90,000,000 a month and their working capital was some $72,000,000 in 1965. As of December 31, 1963, their combined investments were $1,242,000,000. The Pennsylvania and Central systems are each made up of underlying corpo-

rations. As of the date of the Examiners' Report the merged company would have ownership interest in 182 corporations and 10 railroads under lease. Thirty-six of the corporations are rail carriers, in six of which the merged company would have a voting control. All six are Class I railroads. It would likewise control six Class II railroads, five switching and terminal railroads, a holding company, five car-leasing companies, four common carriers and 34 noncarrier corporations.

The NH [2] is the sixth largest railroad in the Northeastern Region and the largest in New England. On a national basis it ranks fourth among passenger-carrying railroads and is one of the largest nontrunkline freight roads. It has some 1,500 miles of railroad in four States—Massachusetts, Rhode Island, Connecticut, and part of New York. NH has been in reorganization under § 77 of the Bankruptcy Act, 47 Stat. 1474, as amended, 11 U. S. C. § 205, since 1961.[3] While its gross revenues have run in excess of $120,000,000, it has run deficits since 1958. During the trusteeship its deficits have run from $12,700,000 in 1962 to $15,100,000 in 1965.

### III.

*The protesting parties, their setting in the Northeastern Region and their position on the merger.*

Altogether some 200 parties participated in the proceedings before the Commission, some in support of and others in opposition to the merger. None of the appellant railroads challenge the merits of the merger; however, appellants Milton J. Shapp and the City of Scranton both attack the merger on its merits. Aside from Penn-

---

[2] We include it in this discussion since the Commission intends to include it in the Penn-Central system as soon as terms and conditions are agreed to or fixed.

[3] *In the matter of the New York, New Haven and Hartford Railroad Company—Debtor*, No. 30226 U. S. D. C. Conn.

Central and NH, there are 10 other carriers involved in this proceeding.

Three of these are the protected carriers—B & M, D & H and E–L. B & M operates a freight and passenger service in Maine, New Hampshire, Vermont, Massachusetts and New York over some 1,500 miles of road. It has suffered consecutive deficits in net income for some years and has not appealed from the decision of the District Court. D & H operates about 750 miles of road with some 600 in New York, less than 50 in Vermont and the balance in Pennsylvania. Its net income in 1965 was $5,000,000, its highest year since 1960. E–L operates some 3,000 miles of railroad located in New Jersey, New York, Pennsylvania, Ohio, Indiana and Illinois. Its net income was over $3,000,000 in 1965 but it suffered heavy deficits in the seven preceding years. As we have previously noted, these three railroads have filed applications for inclusion in both this case and in *Norfolk & W. Ry. Co. and New York, C. & St. L. R. Co.—Merger,* 324 I. C. C. 1.[4] The Commission has withheld action on the inclusion of E–L, B & M and D & H, in Penn-Central until there is a final determination of their inclusion proceeding with Norfolk and Western (N. & W.). In the latter proceeding Commissioner Webb filed his report on December 22, 1966, recommending the inclusion of E–L and D & H in the N & W system but was unable to prescribe terms for inclusion of B & M—this was left to private negotiation between the railroads. On argument here the Commission has indicated that it antici-

_____

[4] This proceeding involved the merger of the Nickel Plate. E–L sought inclusion in this proceeding along with B & M and D & H. After E–L had withdrawn its application the Commission found that the merger "should have no harmful effects" on B & M and D & H. The Commission retained jurisdiction for five years to permit E–L, B & M and D & H to again petition for inclusion. See 324 I. C. C. 1, 19–31. Each of the roads so petitioned and it is this inclusion proceeding that is now before the Commission.

pated entering a final order in the matter by July or August 1967. If this is favorable these three roads would be included in the N & W system, which has indicated its acquiescence in such a plan.

Six additional railroads involved here are the C & O, B & O, the Central of New Jersey (CNJ), the Reading Company, the Norfolk and Western, and the Western Maryland Company (WM). The C & O–B & O system is the result of a control proceeding in 1962. See *Chesapeake & O. Ry. Co.—Control—Baltimore & O. R. Co.,* 317 I. C. C. 261, sustained, *sub nom. Brotherhood of Maintenance of Way Employees* v. *United States,* 221 F. Supp. 19, aff'd, *per curiam,* 375 U. S. 216 (1963). Together these two roads operate some 10,000 miles of railroad. Their lines extend from Michigan through Ohio and West Virginia to Virginia and from Chicago, Ill., and St. Louis, Mo., to Rochester, N. Y., and Washington, D. C. Their net operating income in 1965 totaled over $80,000,000. In addition, B & O owns 38% voting control of Reading which in turn controls CNJ. Reading has 1,200 miles of railroad in eastern Pennsylvania with net operating revenue of some $8,000,000 in 1965. CNJ has 514 miles of railroad extending from Scranton, Pa., to Jersey City, N. J. In 1965 it had a net operating deficit in excess of $3,000,000. C & O–B & O also own jointly 65% of the voting stock of WM. The latter has 741 miles of railroad extending from Connellsville, Pa., and Webster Springs, W. Va., to Baltimore, Md. In 1965 its net operating income was nearly $8,500,000.

N & W has 7,000 miles of railroad extending in a double prong from Des Moines, Iowa, and Kansas City, Mo., on the west to Buffalo, N. Y., and Pittsburgh, Pa., on the east and from Cincinnati, Ohio, and Bristol, Va., on the west to Hagerstown, Md., and Norfolk, Va., on the east. Its net operating income for 1965 was approximately $118,000,000. As we have noted, an inclusion proceeding

is now pending under which B & M, D & H and E–L seek inclusion in the N & W system.

On October 11, 1965, C & O–B & O and N & W filed an application with the Commission asking approval of their merger into a single system and offering to include B & M, D & H, E–L, the Reading and CNJ therein, subject to various conditions. If this were effected and the Penn-Central–NH merger were effected, the Northeastern Region would then have two giant systems, *i. e.,* Penn-Central and C & O–B & O–N & W.

Only one additional railroad remains a party here, the Chicago and Eastern Illinois Railroad Company (C & E I). It has approximately 750 miles of railroad operating between Chicago, Ill., St. Louis, Mo., and Evansville, Ind., with a net operating income of nearly $3,500,000 in 1965. The Missouri Pacific Railroad Company has already been authorized by the Commission to make C & E I a part of its system. The fear of C & E I here was that the Penn and Central merged would be a more formidable competitor than the Central alone and it, accordingly, sought the imposition here of special routing and traffic conditions.

The only other appellants are the City of Scranton, Pa., and Milton J. Shapp. Scranton is served by E–L, D & H and CNJ. It fears that the merger will have adverse effects upon the city and therefore opposes the merger. Shapp sues as a citizen and stockholder of Penn and is likewise in opposition to the merger.

The United States has filed a memorandum in which it does not "quarrel with the merits of the Penn-Central merger proposal itself." The agencies of the Executive Branch, the Solicitor General reports, "believe that the merger is in the public interest and that its consummation should be promptly effected." This view, however, is based on the assumption "that a place in the emerging pattern of consolidation in the Northeast can be found

for the lesser roads of the region." It is the Commission's approval of the immediate consummation of the merger prior to the completion of the proceedings to determine the place of the lesser roads to which the United States objects. It contends that since the very survival of the three protected railroads is threatened by the Penn-Central merger, the Commission must first provide protection for them until their absorption by "a major system like Norfolk and Western." To this end the United States suggests that we hold the case to enable the Commision to conclude the related proceedings which it now has under consideration. The United States concludes that: "Only if the Commission is unable to promptly resolve the problems resulting from the merger would we deem it appropriate to urge this Court to reach the merits of the appeals and reverse the judgment below."

The appellant railroads take varying positions all short of attacking the merits of the merger. The three protected railroads contend that the merger should not be consummated prior to the final determination of their inclusion in some major system or the enforcement of effective protective conditions in the interim. Judicial review, they say, of the protective conditions would otherwise be illusory. The C & O–B & O group and the N & W system maintain that the conditions of the April 6, 1966, order give the protected railroads a vested interest in the Penn-Central merger which would result in the protected railroads diverting traffic to Penn-Central which would normally have gone to them. They say, as does the United States, that the conditions were drawn without the benefit of notice and hearing, are deficient and enforcement thereof would be to their detriment. C & E I points to what it calls inconsistent findings as to the benefits it will have "of intensified competitive efforts" by its connecting carriers on routes in competition with

Penn-Central. It contends that the indemnity conditions would "compound the economic injury" which would befall the C & E I as a result of the merger and which prompted it to request protective measures.

## IV.

*The national transportation policy and practices of the Commission thereunder.*

This Court has often pointed out that the national transportation policy "is the product of a long history of trial and error by Congress . . . ." *McLean Trucking Co.* v. *United States,* 321 U. S. 67, 80 (1944). In that case it found that the Transportation Act of 1920 "marked a sharp change in the policies and objectives embodied in those efforts." *Ibid.* In that Act the Congress directed the Commission to adopt a plan for consolidation of the railroads of the United States into "a limited number of systems." 41 Stat. 481 (1920). Consolidation would be approved by the Commission upon a finding that the transaction was in harmony with and in furtherance of the complete plan of consolidation and that the public interest would be promoted. But the Commission was warned that "competition shall be preserved as fully as possible." *Ibid.* The initiation of this unification, however, the Congress left wholly with the carriers. The Commission was given no power to compel mergers. This pattern was carried forward in the Transportation Act of 1940, 54 Stat. 898; however, § 5 of the former Act was amended to authorize the Commission to approve carrier-initiated proposals which it found to be consistent with the public interest and upon just and reasonable conditions. Under § 5 (2)(d) additional power was given the Commission to condition its approval of a merger upon the inclusion, upon request, of other railroads operating in the territory involved. As we said in *County of Marin* v. *United States,* 356 U. S.

412 (1958), "the result of the [1940] Act was a change in the *means,* while the *end* remained the same. The very language of the amended 'unification section' expresses clearly the desire of the Congress that the industry proceed toward an integrated national transportation system through substantial corporate simplification." *Id.,* at 417–418. The Commission has, therefore, not proceeded by or under "a master plan" for consolidation in the various regions. Following this procedure the Commission has refused to consolidate the Northeastern Region railroad merger or control proceedings into one case. See *Chesapeake & O. Ry. Co.—Control—Baltimore & O. R. Co., supra,* at 265–266, and *Norfolk & W. Ry. Co. and New York, C. & St. L. R. Co.—Merger, supra,* at 18. Also *Brotherhood of Maintenance of Way Employees* v. *United States,* 221 F. Supp. 19, at 29–31; aff'd *per curiam,* 375 U. S. 216 (1963).

It is contended that the order here is fatally defective for failure to comply with § 5 (2)(b) of the Act which requires the Commission to "enter an order approving and authorizing such transaction, upon the terms and conditions, and with the modifications, so found to be just and reasonable." The claim is that by leaving the indemnity provisions open for future determination the Commission did not meet the requirements of the section. Once a valid order is entered by the Commission, it, of course, has the power to retain jurisdiction for the purpose of making modifications that it finds necessary in the light of subsequent circumstances or to assist in compliance with prior conditions previously required or, of course, to correct any errors. The Commission also has power under § 5 (9) of the Act to make certain supplemental orders and under § 17 (3) may correct clerical errors in certificates. We do not find it necessary to pass upon the question of naked power in the Commission to

do what has been done here. Even assuming that it does have that power, we find that its order approving immediate consummation of the merger is insupportable on its findings.

## V.

*Conclusions.*

The Commission found in its April 6, 1966, order that the protected railroads would be adversely affected to a "serious degree" by the Penn-Central merger; that they would be "severely handicapped" in providing required transportation to the highly industrialized areas that they serve, which service is "essential" and "the public service dictates that it be preserved." It then held that immediate consummation of the merger would be consistent with the public interest only if the conditions of Appendix. G were immediately imposed. And, significantly, it concluded that even though it approved the merger, consummation of it would not be permitted unless the protected railroads "are protected during the period necessary to determine their future . . . ." 327 I. C. C., at 529, 532. But after this suit was brought and strong opposition to Appendix G was voiced, the Commission, on September 16, 1966, withdrew all of the conditions of Appendix G save the traffic ones. This left the protected railroads without sufficient protection according to the Commission's own findings. This was done apparently because of the vehement objections of the appellant railroads that Appendix G would cause havoc rather than give shelter. We cannot say, as did the District Court, that the September 16, 1966, order meant nothing more than that the traffic conditions left imposed by it were in themselves sufficient to protect the three protected railroads during the interim between the merger and the decision as to their future in one of the major railroad systems. This interpretation runs in the face of not only the prior findings enumerated above but the specific terms and conditions of Appendix G found

to be necessary to prevent "impairment or serious weakening" of the three carriers. *Id.*, at 532. Indeed, rather than being tentative, the requirements of Appendix G were rigidly fixed and established for the entire period preceding inclusion of the protected roads in some major system. The finding of consistency with the public interest was predicated entirely upon the unqualified acceptance of Appendix G by Penn-Central. Otherwise the merger would be put off for two years. In its effort to expedite the merger the Commission failed to provide the very protection that it at the same time declared indispensable to the three roads. This leaves the ultimate conclusion—that prompt consummation of the Penn-Central merger clearly would be in the public interest—without support and it falls under the Commission's own findings.

In view of these facts and since none of the findings of the Commission were disturbed, attacked, or amended, we believe it was error to permit the merger to be effected. And we also note that even in the ultimate order of approval dated September 16, 1966, the Commission pointed out that its "finding [as to the merger being consistent with the public interest] was that, if the immediate consummation were to be authorized E–L, D & H and B & M would require special protection during the pendency of their petitions for inclusion in a major system." Nevertheless, in spite of this confirmation of its finding, the Commission ordered the merger immediately consummated without the "special protection" afforded by Appendix G. Having found that the finding of consistency with the public interest could only be sustained by the imposition of the Appendix G "special protection," the Commission failed to meet its statutory obligation when it arbitrarily removed the special conditions of Appendix G while leaving the prior finding standing.

In view of the patent invalidity of the order permitting immediate consummation of the merger and in light of the present status of the proceeding before the Commission, we can only conclude that it is necessary that the decision as to the future of the protected railroads and their inclusion in a major system be decided prior to consummation of the Penn-Central merger. This is especially true since the findings and recommendations of Commissioner Webb, as to the inclusion of the three protected railroads, are now under submission to the full Commission and a decision should be reached thereon by July or August 1967, we are advised by counsel. This short time would have little effect upon the ultimate consummation of the merger—which has been in the making for some 10 years now—and if it resulted in the future of the protected railroads being finally decided, serious losses to them would be obviated. Furthermore, there would be no occasion for the conditions of Appendix G to be imposed and hearing and decision on this highly controversial matter would not be necessary insofar as the three protected railroads are concerned. Finally, such action would provide the solution to the problem of the necessary and indispensable protection to the three railroads that the Commission found prerequisite to the merger.

Furthermore, the serious charge that the conditions of Appendix G were imposed without notice and hearing would in a large part be dissipated by this course of action. As to the three protected roads it would be entirely obviated if and when their fate is determined. As to the other railroads affected, the Commission could more quickly conclude its present hearing and make a decision as to the effect of the merger upon them and the protection, if any, required.[5]

---

[5] Among these, CNJ claims it has been deprived of a hearing on the effect on it of the inclusion of the NH in the Penn-Central merger. As the Commission points out, however, the terms and

This disposition is also buttressed by the fact that should the immediate consummation of the merger be permitted and at a later date neither the interim conditions nor the inclusion proceedings be disposed of favorably to the continued existence of the merger, the only remedy remaining would be to set it aside and unscramble the consolidation. It is said that this does not follow since only the indemnity terms are at issue and they involve only money. This is blinking at reality. The fact is that traffic, trackage, terminals, etc., as well as financial and corporate structures can and will, beyond doubt, be quickly combined, changed, abandoned, or consolidated. The only condition now imposed for the maintenance of the *status quo* is the provision against any change of routes, traffic, rates, etc., as to business in which the three protected roads participate. They are comparatively small lines located for the most part in northeastern coastal States and would, percentagewise, be a small part of the total routes, traffic, rates, etc., of the whole Penn-Central system. There would be no restriction as to other routes, traffic, rates, etc., as well as all other operations of the merged company, including terminals, warehouses, etc., financial and corporate structures. The plan that the Penn-Central proposes to follow, as we have briefly sketched it, indicates not only

conditions of the NH's inclusion are subject to further proceedings and the Commission has specifically given to CNJ leave "to seek protection for [its] traffic and gateways," at that time. 327 I. C. C., at 527. Moreover, CNJ also says, it has not been afforded a hearing on its claim that the merger will also deprive it of important overhead coal traffic now delivered by CNJ to D & H at Wilkes-Barre, Pa. This might be lost, it alleges, because of the direct connection between D & H and N & W which will be available over the trackage rights that Penn-Central is being required to grant D & H. We know nothing of the merits of these claims and, of course, indicate no decision thereon. However, we assume that the Commission will in each instance afford the CNJ an opportunity to be heard concerning them.

major changes but quick action. Our experience with other mergers, and common sense as well, indicate that the "scrambling" goes fast but the unscrambling is interminable and seldom effectively accomplished.

The Penn-Central merger has been studied for a decade. Indeed, the parties to the merger agreed to it over five years ago and it has been under Commission consideration ever since that time. This is, of course, the more reason for expedition. We note and give weight to the estimates of the Commission that the inclusion proceedings of the three roads in the N & W should be concluded in "a relatively short time." Our remand should, therefore, entail only a very short delay before the Commission. If its order is attacked in court the hearing there can be expedited, as was this one, and an early determination made. We do not believe that this is too high a price to pay to make as certain as human ingenuity can devise, a just and reasonable disposition of this matter for all of the parties. After all, it is the largest railroad merger in our history and if not handled properly could seriously disrupt and irreparably injure the entire railroad system in the northeastern section of the country—to the great detriment not only of the parties here but to the public convenience and necessity of the entire Nation.

The judgment of the District Court is reversed and the cause is remanded with instructions that it be remanded to the Commission for further proceedings not inconsistent with this opinion. *It is so ordered.*

## APPENDIX TO OPINION OF THE COURT.

### APPENDIX G.*

*Provisions for the Protection of E–L, D & H, and B & M.*

1. Pending final determination of the petitions for inclusion filed by E–L, D & H, and B & M in this proceed-

---

*327 I. C. C. 475, 561.

ing and in Finance Docket No. 21510 et al., or such other period of time as the Commission may prescribe, hereinafter called the protective period, and on traffic for which E–L, D & H and B & M are competitive factors, the merged company shall not publish or provide for any new or changed routing practice and/or freight rates or services, either locally or jointly with other carriers, which would divert or tend to divert traffic from routes in which E–L, D & H or B & M, now participates, or participated at the time this merger application was filed, or take any action or engage in any practice or conduct contrary to the purpose and general objectives of this condition as explained in this report.

For the purpose of illustrating—but in no way limiting—the application of this condition, the following specific provisions are prescribed:

A. During the protective period, and as to the described traffic, the railroads which shall make up the merged system will be considered separate railroads, as they now are, for the purposes of establishing new routes or rates or privileges and changes in present routes, rates or privileges.

B. When any of the described freight traffic is delivered to carriers of the merged system, it shall be allocated among the routes of the system in accordance with practices employed by the system's railroads at the time this merger application was filed.

C. Where through routes and joint rates are now in existence via any component railroad of the merged system and E–L, D & H or B & M, the participation therein of such components shall be maintained during the protective period with the same vigor as such components have heretofore exercised in competition with each other and other carriers, to the end of preventing noticeable diversion from such routes to any other route in which the merged company participates.

D. The merged company for the protective period shall agree to joint rates and divisions thereof on its freight traffic interlined with E–L, D & H or B & M under terms no less advantageous to E–L, D & H and B & M than are the terms which those three carriers now have with the component carriers of the merged system, and, in the event of any changes in such joint rates, the divisions shall not be changed in any manner which will result in E–L, D & H or B & M receiving proportionally less than they now receive on joint rates with such component carriers.

E. In conjunction with E–L, D & H and B & M, the merged company shall, during the protective period, keep open all routes now in force for the transportation of freight over the lines of the three companies and the component carriers of the merged system; shall maintain thereon service equal to or better than that being given on the date this merger application was filed; shall improve such service, to the extent within its power, at least as necessary to make the said through routes fully competitive with other routes in which the merged company participates; and, where joint rates are now in effect or were in effect when this merger application was filed, it shall maintain such rates; and where change in those rates becomes appropriate, changes shall conform to the requirement of provision D above.

2. The term "competitive factor" shall be construed to mean that at the date of this order or at the time this merger application was filed, E–L, D & H or B & M was both participating in the particular route, rate or service and was handling traffic thereon.

3. E–L, D & H and B & M shall be indemnified by the merged company under the circumstances and according to the plan specified in the report, *supra*.

4. This appendix constitutes a plan for protection against the effects of the applicants' merger and does not

apply to loss caused by: (a) hostile or warlike action by (1) any government or sovereign power (*de jure* or *de facto*) or (2) military, naval or air forces; (b) insurrection, rebellion, civil war, et cetera; (c) national disaster; (d) economic depression; (e) strikes; (f) act of God; or (g) other similar state of affairs.

5. The interpretation, application and enforcement of the conditions in this appendix shall be governed exclusively by the following provisions:

A. All controversies arising under this appendix shall be determined with finality by the Interstate Commerce Commission in the manner indicated below.

B. (1) Except as to section 3, *supra,* whenever E–L, D & H or B & M considers that these protective conditions are being violated, or that a violation will result from the effectuation of a tariff publication in which the merged company participates, they may (individually or collectively) file a complaint with the Commission, Board of Suspension, and with the merged company, specifying the rate, route, practice, privilege, or such matters constituting the alleged violation and setting forth in a statement verified by an appropriate official of the complainant all the data giving rise to the complaint.

(2) In the event the Board of Suspension shall determine that, as to the matter complained of, E–L, D & H or B & M is a competitive factor (as defined in these conditions), it shall in the case of a tariff publication not yet effective, suspend the tariff forthwith for the protective period (as defined in these conditions), and shall conduct an investigation into the matter complained of; and if the alleged violation is found not to exist, the Board shall thereupon order the suspension removed; and, in all matters not involving a tariff not yet in effect, the Board shall investigate the matters complained of; and, if in any investigation, it finds that these protective

conditions are being violated, it shall order the cancellation of the violative tariff provisions or, where a tariff is not involved, the termination of the violative conduct. Orders of the Board shall have force and effect as orders of this Commission and shall be enforced as such.

C. All controversies arising under section 3 above, shall be determined by the Commission, Finance Board No. 2. Complaints, verified by an appropriate officer of the complainant, shall be addressed to such Board and the merged company, specifying both the basis of the complaint and the relief sought.

D. (1) All determinations as to whether E–L, D & H or B & M is a competitive factor shall be made within 10 days after a complaint is filed; and final decisions as to issues raised by a complaint shall be rendered within 90 days after the complaint is filed.

(2) Appeal shall lie to the Commission, division 2, from orders of the Board of Suspension; and to the Commission, division 3, from orders of Finance Board No. 2.

(3) Special rules for proceeding before the Boards and appealing therefrom shall be promulgated by this Commission at a future time.

6. Notwithstanding the provisions of sections 1, 2, 3, 4, and 5, an agreement pertaining to the interests of E–L, D & H and/or B & M may be hereinafter entered by the merged company and the protected carriers, or any of them, which shall supersede the protection provided by such sections to the extent the agreement does not violate the provisions of the Interstate Commerce Act or the Commission's rules and regulations thereunder.

7. In the event applicants fail to accede to the above-named conditions, consummation of the proposed merger will be deferred for 2 years or such time as the Commission may determine to be necessary to protect the interests of D & H, B & M and E–L.

8. These conditions shall be construed, administered and·enforced with the view to protecting the E–L, D & H, and B & M and the shipping public which depends upon them for transportation, against the effects of the merger for the period and purposes set forth above.

9. These conditions are to be applied in addition to the standard conditions set out in appendix I hereof.

Mr. Justice Brennan, concurring.

I join the Court's opinion. In its determination whether the merger is consistent with the public interest, the ICC did not discharge its statutory duty to consider the effect upon that interest of the inclusion, or failure to include, the E–L, D & H and B & M. The ICC order authorizing immediate consummation of the merger as consistent with the public interest must therefore be set aside.

I.

The ICC's approval of the Penn-Central merger is the last of three authorizations for consolidation of major eastern roads. In the first, the C & O was allowed to control the B & O.[1] In the second, the N & W was permitted to merge with the Nickel Plate.[2] The ICC has been confronted with the problem of what to do with the E–L, D & H and B & M since they petitioned for inclusion in the proposed N & W-Nickel Plate system as a condition of approval. E–L's precarious financial condition led to that carrier's withdrawal of its petition in favor of inclusion by negotiation, 324 I. C. C. 1, 21, and as a consequence of the denial of the D & H and

---

[1] *Chesapeake & O. Ry. Co.—Control—Baltimore & O. R. Co.,* 317 I. C. C. 261, sustained *sub nom. Brotherhood of Maintenance of Way Employees* v. *United States,* 221 F. Supp. 19 (D. C. E. D. Mich.), aff'd *per curiam,* 375 U. S. 216.

[2] *Norfolk & W. Ry. Co. and New York, C. & St. L. R. Co.—Merger,* 324 I. C. C. 1.

B & M petitions, 324 I. C. C., at 31–32. In the meantime, the Penn-Central proposal had come before the Commission, and D & H, fearful that the Penn-Central merger might be approved and consummated before its inclusion in a major system was assured, argued that approval of Penn-Central be held up by consolidating the two proceedings, or that immediate consummation of N & W-Nickel Plate should be made contingent on inclusion upon equitable terms of the three roads in the event Penn-Central is later approved. 324 I. C. C., at 30–31. The ICC denied these requests, but recognizing there, was substance to D & H's fears, it retained jurisdiction for five years to permit the roads to file petitions for inclusion in the N & W system. Inclusion was to be required upon equitable terms if "found consistent with the public interest," and consummation of the merger would constitute "irrevocable assent" by N & W to the condition. 324 I. C. C., at 148.

Before N & W-Nickel Plate was approved, the Penn-Central proposal had been filed. The three roads, appreciating the danger Penn-Central would pose to their survival, sought inclusion, conditioned upon denial of their inclusion in N & W. Soon after, negotiations between E–L and N & W for voluntary inclusion apparently broke down, because at approximately the same time the three roads filed petitions for inclusion in N & W, and N & W and C & O filed applications to merge with each other, stating that only such a merger could support the inclusion of the three roads in N & W on equitable terms and consistently with the public interest. The three roads urged in their applications both for inclusion in Penn-Central and for inclusion in N & W, that Penn-Central be delayed until their inclusion in one of the systems was assured. This was tantamount to a request that the two proceedings be consolidated for decision, and the Department of Justice supported their position.

The ICC found, as the three roads alleged, (1) the service rendered by the three roads "is essential and the public interest dictates that it be preserved," and (2) it is "doubtful that, without inclusion in a major system, these three carriers could withstand the competition of, the applicants merged . . . ." 327 I. C. C. 475, 529, 532. All the parties concerned recognized, however, that inclusion of the roads in N & W would be preferable to inclusion in Penn-Central, and that it would be some time before the N & W inclusion proceeding was completed. Rather than delay consummation of Penn-Central, which the ICC found would result in substantial savings and improved service, the ICC ordered immediate consummation. It pointed out that the three roads had petitions for inclusion in N & W pending, and provided that, in the event inclusion in N & W was denied, the three roads could petition the ICC for one year following the judgment of denial to allow or require inclusion of the roads in Penn-Central, on equitable terms, if found to be in the public interest. 327 I. C. C., at 553. Meanwhile, in addition to usual conditions for preserving existing routes and gateways, the ICC prescribed "unprecedented" conditions of two kinds: (1) traffic conditions requiring Penn-Central to continue existing practices and route patterns with respect to traffic competed for by the three roads; (2) conditions guaranteeing the three roads an indemnity computed on the basis of a fixed share of the combined total of the revenues realized by them and Penn-Central; this was to compensate the roads for income lost from diversion of their traffic to Penn-Central. 327 I. C. C., at 532. These conditions were acceptable to Penn and Central but not to the three roads or to N & W and C & O–B & O.

Proceedings to set aside the ICC order were brought in the District Court and petitions for reconsideration were also filed with the ICC. Some of the latter attacked

the validity of the conditions on the ground that they were imposed without hearing. E–L and D & H, however, renewed their complaint against the approval before assurance of their inclusion in a major system and alternatively attacked the conditions as indefinite and inadequate, demanding in addition to be indemnified for capital loss. C & O–B & O and their family lines for the first time introduced evidence that the merger would adversely affect them, and argued that the indemnification condition of the original order would create a community of interest between the protected roads and Penn-Central. The Department of Justice urged postponement to consider the questions raised concerning the conditions and the evidence of adverse effect offered by C & O–B & O.[3]

---

[3] Pennsylvania and Central claim we should not pass upon the Department of Justice's contention that the Commission should have delayed consummation until inclusion of the smaller roads in a major system was assured. The issue is, however, presented by the ICC itself, in its statement of Questions Presented, where it recites that, whether the District Court erred in refusing to enjoin consummation pending assurance of inclusion, is a question embraced within the general question presented on these appeals. Brief of the ICC, p. 4. A number of the railroad appellants, moreover, claim they have properly presented the question of delay pending inclusion. These representations amply fulfill the requirement of this Court's Rule 15 (1)(c)(1), and the point has in fact been fully briefed and argued.

Neither is there merit to the claim that this issue, clearly raised before the ICC, 327 I. C. C., at 528, was not raised before the District Court. Counsel for D & H complained that the Commission found "the only way the D & H could be protected is through inclusion in some system, but they have not yet made a finding . . . as to whether our inclusion in any system is consistent with the public interest," Transcript, p. 58, and counsel for C & O was unable to answer meaningfully Judge Friendly's comment that his "position is really that the merger cannot be consummated until all these other proceedings are carried to a conclusion . . . ," id., at 80. The District Court explicitly rejected "the claims that con-

The ICC rescinded the indemnity conditions pending a hearing on whether they should be modified and whether a capital loss indemnification condition should be added, but refused on the ground of laches to hear the evidence offered by the C & O. 328 I. C. C. 304, 318. The ICC reaffirmed its approval of the merger subject to Penn-Central's acceptance of the conditions as finally formulated, although not foreclosing Penn-Central from seeking judicial review of any provision for capital loss indemnification. 328 I. C. C., at 329. The District Court denied interlocutory relief enjoining Penn and Central from going forward with the merger.[4]

## II.

The statutory duty of the ICC is clear. Section 5 (2)(b) of the Interstate Commerce Act, as amended by the Transportation Act of 1940, authorizes the agency to approve only those consolidations it finds "will be consistent with the public interest . . . ." 54 Stat. 906, 49 U. S. C. § 5 (2)(b). The statute creates no presumption that mergers generally are either consistent or inconsistent with that interest; rather, it requires that each proposal be examined in depth to determine its effects upon the national transportation system. Thus, the ICC is explicitly directed to consider "(1) The effect of the proposed transaction upon adequate transportation service to the public; (2) the effect upon the public interest of the inclusion, or failure to include, other railroads in the territory involved in the proposed transaction; (3) the total fixed charges resulting from the proposed transaction; and (4) the interest of the carrier employees

---

summation of the merger should be deferred until conclusion of all pending rail merger proceedings . . . ." 259 F. Supp. 964, 972.

[4] Although this case arises as an appeal from the District Court's denial of motions for interlocutory injunction, the parties recognize that the lawfulness of the ICC's order permitting immediate consummation of the merger is in issue before this Court.

affected." 49 U. S. C. § 5 (2)(c). The National Transportation Policy is the controlling guide, *McLean Trucking Co.* v. *United States,* 321 U. S. 67, 82, and that policy requires the Commission "to promote safe, adequate, economical, and efficient service and foster sound economic conditions in transportation and among the several carriers . . . to the end of developing, coordinating, and preserving a national transportation system by water, highway, and rail, as well as other means, adequate to meet the needs of the commerce of the United States, of the Postal Service, and of the national defense." 49 U. S. C., note preceding § 1. These provisions call for the application of discerning judgment to a wide range of factors, and preclude the position that the purpose of the 1940 Act is simply to promote railroad consolidation.[5] The ICC has recognized that inquiry into a proposed transaction does not end with the possibilities for increased economies, but extends to "the effect of the transaction upon adequate transportation service to all parts of the public which would be so affected," [6] which encom-

---

[5] The ICC's most recent pronouncement on the issue is in *Great N. P. & B. L. R. Co.—Merger,* F. D. No. 21478, p. —, decided March 31, 1966, reconsideration granted January 4, 1967:

"The legislative history of section 5 clearly shows that the Congress did not adopt a policy fostering or encouraging railroad unifications. It was the Transportation Act of 1920, not the Transportation Act of 1940, that embodied a policy favoring railroad consolidations. . . . No such policy is expressed in section 5. To interpret section 5 as implying such a policy is a perversion of legislative history and intent. The public interest scale is balanced. It is not to be tipped by the slightest presumption for or against merger."

It is meaningless, of course, to contend that the Act favors unifications that are otherwise consistent with the public interest; it also disfavors unifications inconsistent with the public interest.

[6] *Chicago, B. & Q. R. Co.—Control,* 271 I. C. C. 63, 146. See also *Detroit, T. & I. R. Co.—Control,* 275 I. C. C. 455, 489, sustained *sub nom. New York, C. & St. L. R. Co.* v. *United States.* 95 F. Supp. 811 (D. C. N. D. Ohio).

passes the "duty, as an administrative matter, to consider the effect of the merger on competitors and on the general competitive situation in the industry in the light of the objectives of the national transportation policy." *McLean Trucking Co.* v. *United States, supra,* at 87. "The public interest is the prime consideration, and in making that determination we must have regard for all relevant factors." *Toledo, P. & W. R. Co.—Control,* 295 I. C. C. 523, 547.

A critical factor, not in my view properly applied in this case, is "the effect upon the public interest of the inclusion, or failure to include, other railroads in the territory involved in the proposed transaction . . . ." [7] The Commission is authorized, "as a prerequisite to its approval of the proposed transaction, to require, upon equitable terms, the inclusion of another railroad or other railroads in the territory involved, upon petition by such railroad or railroads requesting such inclusion, and upon a finding that such inclusion is consistent with the public interest." 49 U. S. C. § 5 (2)(d). The ICC recognizes that it is required to consider the issue of inclusion even when no petition is filed,[8] because if a proposed transac-

---

[7] The Staff Study by the Commission's Bureau of Transport Economics and Statistics on "Railroad Consolidations and the Public Interest" (p. 46), accurately labels this factor "a highly important criterion, since it involves the basic problem of competition among railroads." Reprinted as Exhibit 11, Hearings before the Subcommittee on Antitrust and Monopoly on S. 3097, 87th Cong., 2d Sess., pt. 2, p. 859 (1962).

[8] When E–L, for example, withdrew its petition for inclusion in N & W the Commission expressly stated that the Transportation Act of 1940 "does not limit our participation in carrier-initiated consolidations to passing upon a proposal on a take-it-or-leave-it basis. We are specifically enjoined to consider, among other things, the effect . . . upon the public interest of the inclusion, or failure to include, other railroads in the territory involved in the proposed transactions." 324 I. C. C., at 26. Accord, *N. Y. Central Securities Corp.* v. *United States,* 287 U. S. 12, 28; *Toledo, P. & W. R. Co.—Control, supra,* 295 I. C. C., at 529.

tion "would endanger or impair the operations of other carriers contrary to the public interest," *Chicago, B. & Q. R. Co.—Control, supra,* 271 I. C. C., at 157, inclusion of the affected carriers is *required* by and not merely consistent with the public interest.

In this case the ICC, although determining that the three roads perform an essential service and that their inclusion in some major system is required by the public interest, takes the position that its duty as to inclusion is sufficiently discharged when it provides for the possibility of inclusion in either N & W or Penn-Central, and meanwhile promises to impose protective conditions. My disagreement is not with the proposition that the Act vests wide discretion in the agency to allow a merger to go forward while conditions as to inclusion are worked out. The Commission has broad authority to approve transactions "subject to such terms and conditions and such modifications as it shall find to be just and reasonable . . . ," § 5 (2)(b), and "may from time to time, for good cause shown, make such orders, supplemental to any order made under paragraph (1), (2), or (7), of this section, as it may deem necessary or appropriate," § 5 (9). It has in fact occasionally reserved jurisdiction (1) to work out equitable terms for an inclusion it has already determined is required by the public interest, *New York Central Unification,* 154 I. C. C. 489, 493–494; [9] and even (2) to determine after consummation whether inclusion will be consistent with or required by the public interest, *Union Pac. R. Co. Unification,* 189 I. C. C. 357, 363.[10] But

---

[9] Accord, *Alton R. Co.—Acquisition,* 175 I. C. C. 301, 313, where the Commission later concluded, 189 I. C. C. 271, 285, that the public convenience and necessity did not require acquisition of the short lines involved. This is also the course followed by the ICC with respect to the New Haven in the Penn-Central proceeding.

[10] Accord, *New York, C. & St. L. R. Co.—Control,* 224 I. C. C. 259, 269, where the Commission, in approving a control application,

decisions of this sort proceed upon the assumption that inclusion will later be possible, and that therefore the finding that the proposed consolidation is in the public interest will not be undermined. This assumption is not always warranted. An inclusion may turn out to be impossible, either because of inability to work out equitable terms, a circumstance upon which inclusion orders have invariably been conditioned, or because upon full consideration the effects of the contemplated inclusion might be regarded as so detrimental that the proposed merger which made necessary the inclusion would be against the public interest.

The Commission must decide, in the first instance, whether the risk of such ultimate developments is acute enough to counsel against approval of a consolidation subject to the working out of the terms of an inclusion or to the working out of both the terms and the inclusion. See Jaffe, Judicial Control of Administrative Action 565–567 (1965). But resort to the practice of deferring the accomplishment of inclusions or other ends required by the public interest must be carefully weighed and reviewed. Where there is little or no danger that inclusion consistent with the public interest and upon equitable terms might turn out to be impossible, it is sufficiently likely, despite deferral, that the Commission will have fulfilled its basic statutory duty. Where there is a significant possibility, however, that a deferred inclusion upon which a finding of public interest is premised will be unattainable or attainable only by setting into motion new forces which have not been weighed in evaluating the basic proposal, then the Commission's statutory duty to consider all the relevant factors has

imposed a condition requiring the applicant to abide by its findings concerning whether the applicant should acquire certain affected short lines.

not been properly discharged. And ICC action of this sort generally creates dangers far greater than those which normally accrue when an agency or court fails to apply the governing standard to all the relevant facts, since the decision to allow consummation is often irreversible, as it concededly is in this case, or reversible only at enormous expense.

Prior authorizations deferring decision on inclusions held to be required by the public interest entailed no significant risk that the ICC had approved a consolidation without fulfilling its statutory duty. When, in *New York Central Unification, supra,* the Commission authorized immediate consummation but retained jurisdiction to assure that terms would be worked out for the purchase of lines whose purchase it had required because their preservation was found to be essential to the public interest, there was no doubt that equitable terms could be arranged. The roads to be included were short lines, complementary to the New York Central system, so consummation of the proposed unification created no reason to expect a detrimental effect. Moreover, the roads were required to submit the issue of value to arbitration in the event they failed to agree. 154 I. C. C., at 493. When, in *Union Pac. R. Co., supra,* the Commission deferred until after consummation both the question whether the public interest required inclusion and the matter of working out terms, there was no indication that inclusion might be impossible because of its effects without rendering the proposed transaction against the public interest, or that equitable terms for inclusion might be unattainable, or that the short lines involved would be subjected to danger from traffic diversion or otherwise during the period between consummation and inclusion. The transaction authorized only accounting changes; no change in

operation was either contemplated or possible. 189 I. C. C., at 363.[11]

This case is in striking contrast. Allegations are made by the Department of Justice and numerous other parties that inclusion of the protected roads in either of the major systems contemplated by the Commission might not be possible consistent with the public interest or upon equitable terms. These arguments demonstrate that, because of possible difficulties involved in the inclusion proceeding and in establishing acceptable interim conditions, the "opportunities for the ultimate inclusion of E–L, D & H and B & M in a major rail system . . ." which the Commission has endeavored to preserve create serious uncertainties.

The first and more obviously uncertain alternative is inclusion in Penn-Central itself. The Commission

---

[11] In *New York, C. & St. L. R. Co.—Control, supra,* one of the two short lines seeking inclusion introduced no evidence at all, while the other made an inadequate showing that the public interest required its preservation and no showing whatever that the proposed control transaction would result in diversion of its traffic. 224 I. C. C., at 266–268. Going out of its way "to the end that the intents and purposes of section 5 may be accomplished . . . ," the ICC left open the door to the short lines' inclusion if they could demonstrate its necessity or desirability. 224 I. C. C., at 269. Other examples of deferral of agency action cited by appellees are inapposite. The ICC has deferred employee protection, reserving jurisdiction to impose necessary terms and conditions. *A. C. Allyn & Co.—Control,* 50 M. C. C. 305, 310–311. The likelihood that this sort of problem will have unexpected consequences is very slight. In *Atlantic Rfg. Co.* v. *Public Serv. Comm'n,* 360 U. S. 378, 392, the Court ruled the FPC could issue a certificate without making a final determination of the vital matter of price, so long as the certificate was conditioned so "that the consuming public may be protected while the justness and reasonableness of the price fixed by the parties is being determined" in subsequent hearings. No injury was contemplated, and the ultimate issue was not likely to be prejudged.

retained jurisdiction to allow the three carriers to seek inclusion in Penn-Central within one year after final denial of any of their petitions for inclusion in N & W. All concerned recognize that inclusion in N & W is the preferable solution, since inclusion of the roads in Penn-Central would create a virtual monopoly of all rail traffic in most of New England and New York.[12] (See Appendix A for a map depicting this result.) It is true that Commissioner Webb said in the N & W inclusion proceeding that "the *Penn-Central* reports indicate that the merger would be consistent with the public interest notwithstanding any lessening of intramodal competition resulting from inclusion of EL, D & H, and B & M," *Norfolk & W. R. Co.—Merger*, F. D. No. 21510, p. 27, but this statement is refuted by the *Penn-Central* reports themselves. Both the Examiners and the Commission expressly reserved for a later time the question whether inclusion of the roads in Penn-Central would be consistent with the public interest,[13] and rather than implying that the merger would be in the public interest despite inclusion of the protected roads, the Examiners' Report and the Commission's opinions indicate that the merger

---

[12] The Examiners found it "highly likely that the public interest" lies in the direction of inclusion in N & W. Penn-Central Report, F. D. No. 21989, Feb. 26, 1965, at 415. The Commission had indicated in the N & W-Nickel Plate proceeding its receptiveness to inclusion in N & W, and it postponed consideration of inclusion in Penn-Central pending the outcome of the N & W inclusion proceeding.

[13] The Examiners stated: "No consideration has been given to the effect of the proposed inclusion here of the D & H, B & M and/or E-L upon competition, and no effort has been made to assess or accommodate the anti-trust laws in light of such action. We believe resolution of such issues would be premature." Penn-Central Report, at 418. The Commission adopted these findings, 327 I. C. C., at 481–482, and explicitly reserved, until after inclusion in N & W was denied, the question "whether inclusion of any one or all of E-L, B & M and D & H in the Transportation Company's system would be consistent with the public interest . . . ," 327 I. C. C., at 531.

was approved under the assumption that the protected roads would be included in N & W.[14]

The "opportunity" for inclusion in the N & W hardly presents a less risky alternative. The N & W proceeding has gone to hearing and Commissioner Webb, acting as Presiding Officer, has issued a report recommending inclusion in N & W of E–L and D & H, and authorizing inclusion of B & M if the parties are able to agree to terms. There has as yet been no action by the ICC on the report; and based upon its contents and the objections raised in this Court, there is a significant possibility, given the present state of circumstances, that inclusion in N & W might be unattainable or attainable only at the price of

---

[14] An elimination of competition in New England and New York was not among even the possible anticompetitive effects of the merger contemplated and weighed. To the contrary, the Examiners drew up a chart (Appendix T–2 of their Report) which incorporated the three roads in the N & W system, and which they used to measure competitive impact. Moreover, the Examiners recommended as a condition of approval that Penn agree to grant trackage rights to N & W between Hagerstown, Maryland, N & W's northernmost terminus in the East, and Wilkes-Barre, Pennsylvania, the southwestern terminus of D & H operations, thereby connecting the roads and enabling them to compete with Penn-Central for traffic between northern New York-New England and the South-southwest. Penn-Central Report, at 429–430. The Commission found it unnecessary to uphold the Examiners' action, since the parties had voluntarily entered into an agreement effectuating the Examiners' views, and since an application for Commission approval of the agreement had not yet been filed. 327 I. C. C., at 528. Finally, in appraising the effect of the merger upon service to New York City, the Examiners anticipated that E–L and N & W together would provide one line of competition. Penn-Central Report, at 433. The Commission likewise assumed in appraising anticompetitive effect that E–L would continue to compete with the applicants in the New York port area, and specifically cited as an example of continuing lines of competition that "N & W can join with E–L, LV [the Lehigh Valley], D & H and B & M, among others, in handling transcontinental traffic to and from the Port of N. Y. and New England . . . ." 327 I. C. C., at 517, 514.

rendering the Penn-Central merger against the public interest, and that, even if inclusion could be accomplished consistent with the public interest, it might be impossible to work out equitable terms. Appellees make much of the fact that N & W, by consummating its merger with Nickel-Plate, "irrevocably agreed to include these three petitioners in their system upon terms agreed upon among themselves or, if necessary, prescribed by [the ICC], provided such inclusion is found to be consistent with the public interest." 327 I. C. C., at 529. But this condition expressly assumes a favorable resolution of both of the questions in dispute. As Commissioner Webb said in the N & W inclusion report:

> "the only obligation expressly imposed on N & W . . . was to include the petitioners if the Commission found such inclusion to be consistent with the public interest and if the Commission also found that the inclusion could be effected on terms 'equitable to all parties involved,' both findings to be subject to full judicial review." N & W Inclusion Report, at 16.

Commissioner Webb's recommended disposition reveals clearly that the dangers stemming from deferral exist even as to inclusion in N & W. He rejected an argument of C & O that its plan for absorption of the three roads into a merged C & O–N & W system was mutually exclusive with inclusion of the roads into an independent N & W, and the contentions of C & O and others that they would be adversely affected by the inclusion. He found inclusion of all three roads consistent with the public interest, pointing out that the roads would be able to survive in N & W despite significant losses to Penn-Central, and that greater intramodal and intermodal competition and better services would become possible. N & W Inclusion Report, at 31–32. However, he found substance to arguments relating to each of the three roads

that their required inclusion would be against the public interest. Since authorization of the Penn-Central merger is premised on a finding that the roads must be included in a major system, these arguments are of great relevance here, and I address myself to them.

As to E–L, N & W argued inclusion would be too great a burden in light of its financial condition; for, although E–L showed a modest profit in 1965 for the first time in years, N & W contended it was too soon to draw any optimistic conclusion and that it was no more able now to absorb E–L than it had been a few years before when the Commission refused to require E–L's inclusion in N & W because of E–L's "precarious financial plight" and "the burden another railroad would assume if it absorbed the Erie-Lackawanna now . . . ." 324 I. C. C., at 25. Commissioner Webb recognized that this argument had some merit, and characterized E–L's growth as "erratic." N & W Inclusion Report, at 17, 10. So enormous is E–L's debt, in fact, that the parties themselves agreed it "precludes a merger of N&W and EL now or at any time in the near future." *Id.*, at 84. As a consequence, the Commissioner recommended that only control of E–L by N & W be required, looking to eventual merger with assumption of liabilities when circumstances would permit. D & H has no financial problem which would interfere with immediate merger, but Commissioner Webb found that the only sufficient connection between D & H and N & W was E–L, and therefore recommended that an order requiring inclusion of D & H in N & W be conditioned on inclusion of E–L, *id.*, at 139, which consequently makes the arguments relating to E–L applicable to D & H as well. With respect to B & M, Commissioner Webb agreed with N & W and refused to recommend that its inclusion in any form be required, because of B & M's poor financial condition and limited prospects for recovery. He recommended only that inclusion be

authorized, in the unlikely event N & W saw fit to agree to pay, within five years of the inclusion, a minimum rate for B & M shares equal to almost twice their value under Commissioner Webb's own appraisal. *Id.*, at 153, 156.

It is not entirely clear, therefore, that E–L and D & H will be ordered included in N & W, and the likelihood that B & M will not be included under present circumstances is great. Therefore, it is reasonably possible that the premise upon which the Commission has proceeded in authorizing consummation of Penn-Central—that all three must be included in a major system—may be unattainable through inclusion in N & W because the required inclusion of at least one and possibly all three may not be consistent with the public interest. Neither is it a sufficient answer to this uncertainty that B & M could be included in Penn-Central, since its value to that system because of the monopoly it would make possible in large areas of New England would make inclusion economically feasible at equitable terms. As we have seen, whether Penn-Central would be worth the price despite this result is a matter of some dispute, which the ICC has never considered.

The Commission's duty to consider all the relevant effects of a consolidation before authorizing it extends, moreover, not only to whether an inclusion necessary to make the proposed transaction consistent with the public interest is in fact attainable, but also to whether such an inclusion, even though attainable, might set in motion events which could put the basic transaction proposed in a less favorable light. Thus, even if it is assumed that inclusion of E–L and D & H in N & W will occur, and that leaving B & M temporarily independent would not undermine the consistency of the Penn-Central merger with the public interest, it is incumbent upon the ICC to consider the potential effects on the public interest of

such an outcome before authorizing consummation. Clearly, the ICC has not done so, and on this record there is a substantial likelihood that effects of enormous significance to the public interest might result.

Commissioner Webb refused to consider N & W and C & O's plan for merger with inclusion of the smaller roads, because he concluded the issue of inclusion could be settled without regard to the plan. It is clear, however, from the Commissioner's recommendations, that adoption of the N & W–C & O plan may well be a consequence of the Penn-Central merger both through its effect on the smaller roads and its effect directly upon N & W and C & O. The uncertainties with respect to inclusion of the roads in N & W will be highly probative evidence when the Commission gets around to considering the N & W–C & O proposal. E–L's large debt, for example, which now prevents its outright merger in N & W, would be less of an obstacle if N & W and C & O were combined and thereby strengthened. Even more significant is the fact that B & M's inclusion, presently regarded as impossible in N & W, would probably be possible if N & W were combined with C & O–B & O.[15]

---

[15] In refusing to recommend requiring B & M's inclusion, Commissioner Webb pointed out that such a course would expose N & W to serious risk "and would foreclose B & M from seeking inclusion in the Penn-Central system or in the proposed N & W–C & O system on terms which, by reason of its strategic value or improved earnings, are more favorable than those justified by the record herein." N & W Inclusion Report, at 154. An N & W–C & O system would, as the Commissioner recognized, be far more able financially to absorb the risk of including B & M, and would be willing to offer more than B & M's actual value, possibly out of the savings contemplated in the N & W–C & O merger. In fact, under the plan offered by N & W–C & O for merger and inclusion, B & M shareholders would receive almost twice the actual value of their holdings, and, significantly, Commissioner Webb settled on this same amount as the minimum rate which N & W must pay if it decides to absorb B & M. *Id.*, at 156.

There is no doubt, moreover, that C & O and N & W will, in addition to offering a solution to the inclusion problem, allege that they stand to be seriously hurt by the Penn-Central system unless they are allowed to combine. Although Commisioner Webb refused to hear evidence offered by C & O to prove such allegations, and although the Commission also refused on the ground of laches to grant C & O's petition, to reopen *Penn-Central* to introduce evidence of traffic diversion, the ICC agreed to modify the finding of the Examiners in this case, Penn-Central Report, at 305, that the net effect of Penn-Central will not be detrimental to C & O, CNJ and other carriers or to their ability to provide general transportation service. Instead, the Commission substituted the finding that a detrimental effect "has not been shown of record . . . ," 328 I. C. C., at 318, and thereby left it open to C & O to allege and prove at some later time that its merger with N & W is in the public interest at least in part because of traffic diversion caused by Penn-Central. With respect to N & W, some evidence of adverse effect from Penn-Central seems probable in light of Commissioner Webb's refusal to deduct from the value of the three roads the losses anticipated through diversion of traffic to Penn-Central, because "N & W has resisted corresponding adjustments. in its own earnings despite its admissions that it would suffer serious losses of traffic to Penn-Central . . . ." N & W Inclusion Report, at 44. The refusal to deduct any of the anticipated losses meant, in effect, that Commissioner Webb proceeded upon the assumption that N & W would lose the same proportion of traffic to Penn-Central as E–L expected to lose.[16]

It therefore appears that Penn-Central will increase the likelihood of, and may actually cause, an affiliation

---

[16] N & W Inclusion Report, at 43. See note 18, *infra*, for further explanation.

of N & W and C & O. The ICC has given no thought to whether such an affiliation would be in the public interest. It would create a virtual rail monopoly in some southeastern States (see Appendix B for a map depicting this result), which includes important traffic in coal between the border States and the Norfolk port area, from where it is exported abroad, and it is strongly opposed by both Penn and Central. Had the ICC faced the problem of inclusion, it might have been led to consider the possibility that Penn-Central could cause or increase the likelihood of an N & W–C & O affiliation. Only by considering this possibility could the ICC fulfill its obligation to consider all the relevant factors before approving the merger.

The "opportunity" reserved by the ICC for inclusion of the roads in N & W is therefore, like the "opportunity" reserved for inclusion in Penn-Central, shrouded in doubt as to whether inclusion could be required consistent with the public interest. Concededly, there is far more reason to believe that voluntary inclusion in N & W could at least be accomplished consistent with the public interest than could inclusion in Penn-Central. But on the other hand, while equitable terms could probably be arranged for inclusion in Penn-Central, it is open to serious controversy whether equitable terms will be attainable for inclusion of the roads in N & W. Commissioner Webb has found, of course, that equitable terms for B & M's inclusion in N & W cannot be worked out, and a possible consequence of this will be to create pressure in favor of the N & W–C & O plan or compel inclusion of B & M in Penn-Central. But even as to E–L and D & H (because its inclusion will probably be dependent on E–L's), the present controversy surrounding the conditions designed for interim protection makes considerably uncertain whether equitable terms will be possible once Penn-Central is consummated.

The purpose of the traffic and indemnity conditions originally imposed but now being reconsidered is to maintain the preconsummation *status quo* between Penn-Central and the three roads. One obvious end inferred from this purpose is to prevent irreparable harm to the three roads. But inherent in the finding that the public interest requires eventual inclusion of the roads in a major system and in the fact that the protective conditions are interim only is the purpose of keeping the roads intact so their inclusion on equitable terms will be possible. There is substantial controversy, however, over the validity and effectiveness of each of the proposed conditions. The Commission has, in fact, reopened the *Penn-Central* proceeding for hearings to determine in what respects the conditions originally imposed should be modified and whether or not a capital loss indemnity should be imposed. 328 I. C. C., at 328. Modifications are to be applied retroactively, and Penn-Central is to have judicial review only on the capital indemnity issue. But despite these assurances, the three carriers and other non-protected carriers attack the conditions on several grounds, at least some of which cannot lightly be dismissed.

There are three types of conditions involved: (1) traffic conditions; (2) indemnity for loss of revenue; and (3) indemnity for capital loss. The traffic conditions are expressly devised to prevent Penn-Central from increasing its competition with the protected roads. In brief, they restrain Penn-Central from taking any action or engaging in any practice "which would divert or tend to divert traffic . . . ," either directly or indirectly, from the protected roads. 327 I. C. C., at 561. While the ICC's authority to impose this restriction is unquestioned, great controversy exists concerning its intended scope. The three roads, relying upon the ICC's expressed intention to prevent "any" loss of revenue "as a direct result" of con-

summation, 327 I. C. C., at 532, claim that Penn-Central may take no step to improve service on routes in which they participate, even if the improvement is designed, for example, to meet truck competition. They also claim that the conditions should be applied retroactively to April 27, 1966, when the ICC released its original decision, in order to eliminate the possibility that Penn and Central could defeat the purpose of the conditions by continuing competitive practices begun between April 27 and consummation or by instituting changes during the intervening period. Penn and Central, on the other hand, take a far more limited view of the conditions' scope, despite their assurances before the District Court that the conditions prevent even solicitation of shippers.[17] Their position at the reopened proceeding, based upon the Commission's reference to maintaining the pre-consummation "status quo," 327 I. C. C., at 532, is that they should be free to offer any amount or quality of service after merger which they could perform individually or jointly before merger. This interpretation apparently would leave Penn-Central free, for example, to reduce rates on any route which was formerly all-Central or all-Penn, or on any presently existing joint route of Penn and Central, or to pool their cars for better flexibility, even though these actions might result in diversion of traffic from a protected line. See generally Brief for the United States on Appendix G Conditions, F. D. Nos. 21989 and 21990, Jan. 16, 1967, pp. 8–12. Whether the traffic conditions will succeed in preventing the deterioration of the three roads to the point at which equitable terms may be unattainable is a question of some diffi-

---

[17] Counsel for Penn and Central represented in the District Court that he construed the traffic conditions to prevent Penn-Central from using its solicitation force to get traffic normally moving on the lines of the three roads routed to the lines of Penn-Central. Transcript, p. 132.

culty. Traffic conditions are limited in their usefulness because they cannot eliminate entirely the more general benefits often obtainable through consolidation (such as unified management, better schedules, simplified tracing of cars, less switching and inspection of cars, and greater advertising resources), and because they cannot be operative upon the shipper. Since the ICC deemed the traffic conditions imposed essential to protect the roads, and since even the most rigid traffic conditions are of limited value, the question whether the view of the three roads or that of Penn and Central should be adopted is as important as it is difficult, and its unsettled state contributes to the doubt as to inclusion.

The indemnity for loss of revenue, now being reconsidered by the ICC, is to be payable to any of the three threatened lines in the event that it fails to realize, during the indemnity period, gross revenues in the same proportion to the combined gross revenues of Penn-Central and the protected line as the indemnity formula fixes for the protected line in the base period. The indemnity is obviously designed to make up for losses of traffic to Penn-Central despite the traffic conditions. The three roads have argued that the indemnity should be modified to increase payments, but take the position that, even as modified, the conditions would be inadequate. The nonprotected roads claim the indemnity condition is unlawful. Quite clearly, the indemnity would provide a financial interest to the protected lines to divert to Penn-Central traffic they would normally handle in connection with other carriers, such as N & W and C & O, in order to increase Penn-Central's proportion of their combined revenues and thereby to increase their own indemnities. Correspondingly it would provide an interest to Penn-Central to divert traffic to the protected lines to increase their proportion of combined revenues and thereby to reduce or avoid indemnity payments.

Whether this community of interest is unlawful or would otherwise be against the public interest has not definitively been settled, since the ICC is still in the process of reconsidering its position. It is relevant here, however, simply to note that the indemnity, viewed by the ICC as essential to interim protection, is meaningfully challenged both as unlawful and as inadequate, and therefore that it too cannot be relied upon to eliminate the doubt concerning whether the protected roads may be damaged during the interim to an extent that would make equitable terms unattainable.

The indemnity for capital loss is advanced by the three roads as essential if the merger is to be consummated prior to inclusion. It is directly related to the problem of assuring that equitable terms for inclusion in N & W can later be reached. Commissioner Webb's definition makes clear the proposed condition's purpose:

> "The term 'capital loss,' as used by N & W, EL, D & H and B & M in their petitions for reconsideration in the *Penn-Central* case, refers to losses of EL, D & H, and B & M traffic to Penn-Central to the extent not offset by traffic gains attributable to their inclusion in the N & W system, with the net annual loss of income, if any, capitalized at an appropriate rate." N & W Inclusion Report, at 25, n. 21.

In effect, this condition would guarantee the three roads the difference between what they would lose to Penn-Central and what they would gain by inclusion in N & W. Unquestionably, its adoption would facilitate inclusion, but the fact is that it has not been adopted, and its adoption in any form would be subject to judicial review at the request of Penn and Central. Moreover, the usefulness of the capital indemnity approach has been vigorously challenged by C & O and N & W. They assert that the indemnity will not succeed in keeping the three

roads in viable condition, since traffic, once diverted, is likely to stay diverted. The ICC should not, they claim, rely upon an indemnity provision which fails to accomplish the continuation of service it has found to be so essential. C & O–B & O Brief on Capital Loss Indemnification, F. D. No. 21989, November 28, 1966. In this connection they raise once again the specter of an N & W–C & O merger, arguing that their proposal is the only acceptable solution to the inclusion problem.

There appears to be some merit in the arguments that some sort of capital indemnity is necessary to assure the attainability of equitable terms for inclusion. While Commissioner Webb left to the ICC in the *Penn-Central* case the issue whether capital loss indemnification should be paid, he did conclude that inclusion of the three roads "in the system chosen by the Commission in the furtherance of national transportation objectives should not be on terms which reflect any diminution of capital value attributable to the traffic diversion impact of the other system. In other words, the petitioners should not be penalized for anticipating the Commission's desire to preserve rail competition in the territory they serve." N & W Inclusion Report, at 28. His valuation of the smaller roads, therefore, did not reflect the diminution of value anticipated to be caused by Penn-Central, and his apparent conviction was that equitable terms could not be worked out on any other basis, unless a capital indemnity were granted. See, *id.*, at 43.[18] In light of these conclusions it can

---

[18] In working out the value of E–L's stock for the purpose of an exchange with N & W, Commissioner Webb, applying the principle of reciprocal adjustments, refused to deduct from E–L's value the estimated impact of Penn-Central without also deducting from N & W's value the estimated impact of Penn-Central. Since N & W submitted no evidence, he proceeded upon the assumption that the impact upon N & W would be proportionate with the estimated impact upon E–L. The result of this was to enable him to discount

readily be seen that the unresolved issue of capital indemnity is important, and therefore that the objections to it create uncertainty on this score as well as over whether equitable terms are possible.

What the ICC has done here by deferring inclusion of the three roads is to defer confronting numerous difficult and important issues which cast substantial doubt upon whether the roads can be included in any major system contemplated for the purpose consistent with the public interest and on equitable terms. In the process it has approved an irreversible consolidation which it found to be in the public interest only upon the premise that the affected roads would be included in a major system. By proceeding in this manner, the ICC has in my view failed to fulfill its fundamental duty to determine whether consolidations are in the public interest on the basis of all the relevant facts. The problems created by a required inclusion obviously are relevant to the question whether the proposal which makes their inclusion necessary is in the public interest. And where, as here, the many problems created are serious and far-reaching, the Commission must consider them before arriving at and implementing with finality its ultimate conclusion.

. While I consider it the ICC's responsibility to weigh the feasibility and effects of an inclusion it deems required by the public interest, I recognize the importance of leaving great flexibility with the agency to deal with emergency situations in order to avoid serious damage to the national transportation system. But it is clear there is no pressing need here which could justify the ICC's action. Commission counsel represent in this Court that the ICC has found "that the merger would

completely E–L's capital loss. If this method of valuation were approved, he noted, "the question of capital loss indemnification . . . [in *Penn-Central*] will become moot." *Id.*, at 47.

result in substantially improved service for the shipping public and in annual savings of at least $80 million for the merged company . . . ." Brief of the I. C. C., p. 52. Improved service and economies are commonly the claimed results of rail consolidations, and proportionately the improvements and savings anticipated in this case are no more substantial than in many other mergers. Moreover, the anticipated $80,000,000 annual saving is to be reached about eight years after consummation, 327 I. C. C., at 501, and even this estimate does not take into account the sharp curtailment that would result from the interim protective conditions which were formulated with the avowed intention of maintaining the pre-consummation *status quo,* see 327 I. C. C., at 532.[19] The ICC stressed the financial condition of Penn and Central, including their "persistently low rates of return" and their need for improved equipment, as a ground for authorizing immediate consummation, 327 I. C. C., at 501–502, but once again, this is a stock reason for merger, usually alleged by at least one party. The fact that a merger will provide financial assistance militates in favor of approval, but it is only one of the many important factors which must be considered, and in the case of Penn and Central this point has lost much of its force, since both have had substantial and consistent increases in their earnings in recent years. See Brief of the I. C. C., p. 55. While this does not necessarily lessen the long-

---

[19] In fact, the more effective are the protective conditions, the greater will be their interference with achievement of the planned economies and improvements. Penn Vice-President Large recently testified at the reopened hearings that "the first two million dollars we save as a result of merger is a good five years away." Transcript of Hearing of December 15, 1966, F. D. 21989, p. 22343. Qualified by the statement that he had made no studies on the matter, he testified that he saw "no chance of any substantial savings in the next two years." *Id.,* at 22344.

term need for consolidation, it does show there is little need for immediate consummation on this ground.

The argument that the survival of the New Haven depends upon undelayed consummation is not pressed here with the same intensity with which it was embraced at the agency level. See 328 I. C. C., at 312. Judge Friendly's opinion put this matter in proper perspective by pointing out that it is "unrealistic to suppose that inclusion of NH in the Transportation Company can be accomplished before conclusion of the Commission's reconsideration in this case . . . ." 259 F. Supp., at 973. The tenable argument here is that, the longer consummation is delayed, the more difficult will become the task of NH's Trustees in reorganizing the company, and the more possible it becomes due to some unanticipated change of circumstance that the merger may fall through entirely. While every effort consistent with the public interest should be made to protect the invaluable services the NH performs, the difficulties anticipated are largely speculative. If this merger is to benefit its proponents as greatly as they contend, it is no fragile package. And although no unnecessary risks should be taken even with a plan so enthusiastically supported and elaborately designed, a proper concern for the public interest and for the protection of the roads threatened by this merger should have led the ICC to delay consummation.

The projected effects of Penn-Central on E–L, D & H and B & M are anything but speculative. Those roads unquestionably will be destroyed unless included in a major system, and the fact that inclusion somewhere is implicitly assured us may be further cause for concern, in light of the contemplated alternatives and of the difficulty and consequences involved in the adoption of either of them. If the ICC should ever be allowed to depart from its statutory duty to consider all the relevant factors before determining the public interest, it certainly should

not be upon the mere recitation of factors favorable to the plan's adoption and of speculative dangers and the inconveniences of private parties. The reason Congress has ordered that all factors, including the effects of inclusion or failure to include, be considered, is to avoid danger to the public interest caused by precipitate action, and there is more than ample evidence of danger to the public interest in this case to warrant unhesitating enforcement of Congress' directive.

### III.

The ICC argues that to delay the merger until the three roads are assured inclusion would amount to a consolidation of the proceedings in *Penn-Central* with the N & W inclusion proceeding, at least for decisional purposes, and that this would constitute a return to the "master plan" approach for railroad unification "unsuccessfully tried under the Transportation Act of 1920, and would probably preclude the consummation of any major rail unification, regardless of its merits." Brief of the ICC, pp. 43–44. The Commission points out that it "consistently has refused to consolidate the Eastern railroad merger or control proceedings," *id.*, at 48, and that the Government's position here is the same as its unsuccessful contentions for consolidation in the *C & O–B & O* and *N & W-Nickel Plate* proceedings.

It is difficult to understand exactly what the ICC is arguing. Certainly no one contends that the Commission is required, as it was by the Act of 1920, to "prepare and adopt a plan for the consolidation of the railway properties of the continental United States into a limited number of systems." 41 Stat. 481. Nor is it argued that the ICC is required to draw up regional plans for consolidation.

On the other hand, it can hardly be said that the ICC is powerless to consolidate proceedings, or for that matter

to plan or to take any other reasonable step to enable itself to perform its statutory obligation as custodian for the development in the public interest of a national transportation system; that the ICC is no longer told to plan does not mean it is unable to do so when planning is necessary to fulfill its duties. The ICC is told in the 1940 Act to "conduct its proceedings under any provision of law in such manner as will best conduce to the proper dispatch of business and to the ends of justice," 49 U. S. C. § 17 (3), and it has in fact recognized that it possesses "the power in appropriate circumstances either to consolidate proceedings in which the issues are similar or closely related, or to postpone a particular decision when so required by the public interest." *C & O—Control, supra,* 317 I. C. C., at 266. But apart from this explicit power, it is clear from a close appraisal of the 1920 and 1940 Acts that the ICC's responsibilities are far broader now and, therefore, that it would be anomalous to find in a comparison of these two pieces of legislation a basis for the sweeping contention that the Commission can no longer plan.

The 1920 and 1940 Acts are similar in several respects. Under both, applications for consolidation are initiated by the parties and approved if found to be in the public interest, and under neither may a consolidation be compelled. The salient difference is that under the 1920 Act the ICC was required to draw up a plan for all the Nation's railroad properties, and was called upon to judge the proposals for railroad consolidation filed with it by private parties in terms of the master plan it had created. Proposals that advanced the plan's fulfillment stood a far greater chance of approval than those that did not, and only in this sense could it be said that parties were unable to initiate plans of their own choice. While the planning function is broad procedurally, however, it was designed to serve only limited ends. Congress'

concern was "largely with financial problems," its chief aim being to overcome the problem which arose from the fact that "rates which would provide reasonable returns for strong systems would not permit weak lines to survive, and if rates were raised to take care of the weak roads, the more prosperous roads would enjoy excessive returns." Leonard, Railroad Consolidation Under the Transportation Act of 1920, at 57, 59 (1946). The decision to encourage consolidation into a limited number of systems was of course designed to establish a stronger railroad industry, but it "was not grounded on the premise that economies from operation and the avoidance of competitive wastes would be the principal means of insuring an efficient and economic railway system . . . , but, rather, on the conclusion that the financial prosperity of rail carriers would be promoted and effectuated if the weak and the strong railroads which exist side by side in the same territory were to be consolidated into balanced railroad systems with respect to earning power." S. Rep. No. 445, Report on the National Transportation Policy by the Special Study Group of the Committee on Commerce, 87th Cong., 1st Sess., p. 234 (1961). In fact, the Act specifically directed the ICC, in drawing up the plan, to preserve competition as fully as possible and to maintain existing routes and channels of trade wherever practicable. In other words; although the ICC was directed to draw up a national plan against which it was to judge whether applications for consolidation were in the public interest, the judgment was to be made rather mechanically, and the plan itself was to be designed to achieve limited, primarily financial goals.

In contrast, as we have seen, the purposes sought through consolidation under the 1940 Act are wide-ranging, and the public interest includes consideration of all factors relating to the National Transportation

Policy. Financial manipulation was deemed inadequate, and the ICC was ordered to weigh numerous, often conflicting, considerations. In light of this "enlarging of the factors or values which an agency must take into consideration," Reich, The Law of the Planned Society, 75 Yale L. J. 1227, 1248 (1966), it seems incongruous to assert that the change from the 1920 Act approach to that of the 1940 Act signifies a change from planning to strictly *ad hoc* adjudication.

It should be clear, in fact, from a full consideration of the ICC's powers, and of the consequences of failing to use those powers, that consolidation and the use of other procedural techniques is not only within the agency's authority, but is often essential if it is to fulfill its function as guardian of the public interest. Section 17 (3), referred to above, appears sufficient to authorize the Commission to adopt procedures calculated to develop complete records with respect to the public interest in particular merger proceedings, and to coordinate separate merger proceedings when necessary to secure the best possible results. Tucker & O'Brien, The Public Interest in Railroad Mergers, 42 B. U. L. Rev. 160, 184 (1962). Within the context of a case-by-case approach, the Commission is authorized under § 16 (11) to "employ such attorneys as it finds necessary . . . for proper representation of the public interests in investigations made by it or cases or proceedings pending before it, whether at the commission's own instance or upon complaint . . . ," and it has done so.[20] It may and often has called upon its staff to develop information in pending cases. In the *N & W-Nickel Plate* proceeding, for example, it called upon its Bureau of Inquiry and Compliance to study

---

[20] Under this power, the Commission called upon Mr. Louis D. Brandeis, later Mr. Justice Brandeis, to represent the public in a general rate increase case. *The Five Per Cent Case,* 31 I. C. C. 351.

and report on which railroads would be affected by the merger. It possesses, with appropriate safeguards, broad powers of official notice,[21] and in recent merger cases it has frequently referred to facts and arguments in other, related merger cases. Moreover, like most other agencies assigned similar functions, it has broad investigative power, which may be used in the context of adjudication or simply to provide background. Section 13 (2) confers "full authority and power at any time to institute an inquiry, on its own motion, in any case and as to any matter or thing . . . concerning which any question may arise under any of the provisions of this chapter, or relating to the enforcement of any of the provisions of this chapter," which includes § 5. The ICC has resorted to various forms of investigations and studies to enable itself to perform its obligations. See generally S. Doc. No. 10, Monograph of the Attorney General's Committee on Administrative Procedure, Part 11: Interstate Commerce Commission, 77th Cong., 1st Sess., pp. 93–96 (1941). Particularly noteworthy is the Staff Study on Railroad Consolidations and the Public Interest, by the Commission's Bureau of Transport Economics and Statistics, which contains an analysis of the Commission's decisions in railroad consolidation cases. Reprinted as Exhibit 11, Hearings before the Subcommittee on Antitrust and Monopoly on S. 3097, 87th Cong., 2d Sess., pt. 2 (1962).

Finally, although the ICC does not promulgate general plans for consolidation, it has the power under § 5 (2)(b) to approve consolidations "subject to such terms and conditions and such modifications as it shall find to be just and reasonable . . . ." This authority encompasses the power under § 5 (2)(d) to make inclusion of a railroad a prerequisite to approval of a merger, and it does

---

[21] See generally 2 Davis, Administrative Law §§ 15.01–15.14 (1958).

not depend upon the request of any private party involved. It has been broadly construed to enable the ICC to implement previously found conditions and to cope with changed circumstances, *e. g., United States v. Rock Island Motor Transit Co.,* 340 U. S. 419; *American Trucking Assns. v. United States,* 355 U. S. 141; *American Trucking Assns. v. Frisco Co.,* 358 U. S. 133, and the Commission has applied this power, when it has seen fit to do so, with great liberality. It has even gone to the point of conditioning its approval of applications to consolidate upon actions to be taken by railroads not even party to the proceeding.[22] In sum, the Commission's practice-certainly is not consistent with its assertion here that its "only 'planning' power" under the 1940 Act is to include railroads in the region. Brief of the ICC, p. 46.

The ICC is pre-eminently an agency "directly and immediately concerned with the outcome of virtually all proceedings conducted before it. It is not intended to be a passive arbiter but the 'guardian of the general public interest,' with a duty to see that this interest is at all times effectively protected." H. R. Doc. No. 678, Practices and Procedures of Governmental Control of Transportation, 78th Cong., 2d Sess., p. 53 (1944); see *Southern Class Rate Investigation,* 100 I. C. C. 513, 603. It is empowered to investigate and gather evidence beyond that presented by the parties where exercise of that power will advance the determination of what best

---

[22] In the *Penn-Central* case, the Examiners recommended, as a condition to approval of the merger, that Penn be required to sell the Lehigh Valley to C & O–B & O, if such sale were later found to be in the public interest, in order to assure New York City an additional competitive line. Penn-Central Report, at 434–435. The Commission felt it did not have to pass upon this recommendation, since Penn agreed after the Examiners' Report was issued to sell LV to C & O–B & O. 327 I. C. C., at 517.

serves the public interest.[23] To the same end, the agency
has wide latitude in fashioning procedures, and a broad
power to condition its approval of proposals. In other
words, the ICC is not the prisoner of the parties' sub-
missions.[24] Rather, the agency's duty is to weigh alter-
natives and make its choice according to its judgment
how best to achieve and advance the goals of the National
Transportation Policy.[25]

---

[23] "A regulatory body such as the Interstate Commerce Commis-
sion cannot properly discharge its duty if it remains ignorant of
relevant facts simply because they were not introduced in evidence.
The Commission should itself supply deficiencies in the record. It
should bring to light material which the parties have either over-
looked or have willfully failed to call to its attention. It should
aid those parties who through lack of resources are unable adequately
to present their cases. It should make full use of the expert knowl-
edge of commissioners and staff, and of the mass of transportation
information that it has accumulated through the years." H. R.
Doc. No. 678, *supra*, p. 70. See *Eastern-Central Motor Carriers
Assn.* v. *United States*, 321 U. S. 194, 208–210, 212, 216–217.

[24] It was the position of the Chairman of the Board of Pennsyl-
vania before Congress that the ICC should leave the fate of the
smaller roads to be worked out after the principal mergers had
been approved. Hearings on S. 3097 before the Subcommittee on
Antitrust and Monopoly of the Senate Judiciary Committee, 87th
Cong., 2d Sess., p. 385 (1962). He testified that if an attempt was
made to stop the three main proceedings, the entire process "would
stop, there is no doubt about it," *id.*, at 384, and responded to the
query whether the ICC "has no alternative but to buy the package
or nothing at all," that "It is the fact . . . ," *id.*, at 397.

[25] There are indications that the ICC has planned all along for
three systems. The most striking of these is the use by the Penn-
Central Examiners of a chart to evaluate the merger's anticom-
petitive effect which accounts for all the smaller roads. Penn-Central
Report, Appendix T–2. It need hardly be said that the ICC would
be proceeding unlawfully if it had determined, without notice or
hearing, that a three-system structure was essential, and had then
gone through the motions of adjudication.

I am therefore not reassured by the ICC's representation that it has "consistently" refused to consolidate the eastern railroad merger proceedings for any purpose or to any degree. The ICC's prior refusals to consolidate are entirely distinguishable, since none of them entailed the risk under the Commission's own findings that a railroad performing essential public service could be destroyed.[26] But more generally, while consolidated consideration provides no simple answer to the ICC's problems, see generally Shapiro, The Choice of Rulemaking or Adjudication in the Development of Administrative Policy, 78 Harv. L. Rev. 921 (1965), the very complexity of its task suggests that consolidated consideration may be a useful procedural device, short of an investigation or prearranged plan, for offsetting at least in part the disadvantages inherent in the isolated case-by-case approach, both in formulating and applying policy.

Although a case-by-case adjudication may offer advantages in flexibility and continual exposure to concrete situations, "the disadvantages of developing policy through a sequence of limited cases are both numerous and impressive." H. R. Doc. No. 678, *supra*, p. 81. A significant disadvantage is that individual proceedings "seldom if ever produce sufficiently comprehensive records for the adequate solution of questions of major importance." *Id.*, at 82. Obviously, without all the relevant facts, the chance of a satisfactory disposition is diminished. Although the ICC has tools to assemble complete factual records, it employed virtually none of them in these highly interrelated proceedings,[27] including the

---

[26] The ICC made no finding that either C & O–B & O or N & W–Nickel Plate would lead to the destruction of any other road. See 317 I. C. C., at 265–266, 282; 324 I. C. C., at 27–31.

[27] There is abundant evidence that the three recent proceedings are highly interrelated. Central petitioned for a general Commission

power to consolidate the proceedings on common issues. Rather, the cases have been rigidly segregated, leading the ICC to resort to extraordinary interim conditions instead of resolving definitively the fate of the three threatened roads. This has had the undesirable effect of enabling each of the major carriers to control the basis for judgment by deciding what evidence to offer or withhold, depending on which course best served its own interest. Evidence of competitive impact has been withheld in one proceeding only to appear at later pro-

investigation during the *C & O–B & O* proceeding, alleging that the ICC should not upset the existing competitive balance before evaluating all the facts and determining the part each proposal should play in the solution of the eastern railroad problem. Numerous other parties in that case also petitioned for consolidation of the proceedings, either for hearing or decision, with N & W-Nickel Plate and later with Penn-Central.

In the *N & W* case, the Justice Department argued that the record was inadequate to determine competitive impact and stated "that only through consolidation can a clear picture be obtained of the effects of the Norfolk & Western-Nickel Plate and Pennsylvania-Central mergers on the Erie-Lackawanna, the Delaware & Hudson, and the New England lines." The relationship between the *N & W-Nickel Plate* and *Penn-Central* proceedings was palpable, not only on the ground that Nickel Plate competed with Central, but also because of the facts that (1) Penn controlled N & W and had taken the position that it would divest only when it knew how it stood with respect to its application to merge with Central, and (2) it was only through Penn's acquiescence that N & W managed to contract for the purchase of the .108-mile Sandusky line which enabled it to link its main line with Nickel Plate's main line, 324 I. C. C., at 74.

Commissioner Webb felt that neither the N & W inclusion proceeding "nor the *Penn-Central* case can be fully understood if consideration of one is divorced from the other. Unfortunately, the Commission's action in deciding the cases separately has tended to blur vital issues common to both proceedings." N & W Inclusion Report, at 23.

ceedings in the form of evidence that the company affected must be permitted to merge with another company to protect itself, or that the anticompetitive impact of the later merger will be limited in light of the increased strength and ability to compete of the companies already allowed to merge.[28] The carriers have been well aware of the opportunity the Commission's practice provides them, as is illustrated by the statement of the Chairman of the Board of Pennsylvania that "if the C. & O.–B. & O. is approved, that is going to help the Nickel-Plate case and if that is approved, it is going to help our case, going to go right around the circle." Hearings, *supra*, n. 24, at 397.

---

[28] The best possible example is what happened in this case. Evidence which Central might have presented earlier in the form of an appraisal of the effects of C & O–B & O and N & W–Nickel Plate upon its ability to operate, took the form in the *Penn-Central* proceeding of the contention that, without a Penn-Central merger, both Penn and Central would be at a competitive disadvantage since neither "separately would compare with C & O–B & O or N & W–Nickel Plate in any element of strength, whether tested by traffic volume, financial results, or the means for improving service." Brief of Applicants, F. D. Nos. 21989–21990, dated June 1, 1964, p. 141. And in appraising the anticompetitive effects of a Penn-Central merger, the Examiners in this case stated that, "[a]lthough in certain . . . categories, the increases [to be brought about by the merger] are significant, the degree of relative dominance by P. R. R. in comparison with the other roads, has been decreased significantly as a result of the consummation of the N & W and C & O–B & O transactions by reason of the fact that these latter two systems have also increased their relative share." Penn-Central Report, at 424. The Commission, too, indicated its conviction that Penn-Central became more justifiable now that the other systems were authorized, by citing "the growing strength of the N & W and C & O–B & O systems" as a check against possible abuse of economic power by Penn-Central, and by pointing out "that applicants will face increasing competition from those two greatly strengthened rail systems." 327 I. C. C., at 514, 519.

It is not that the ICC has been unaware of what has been going on. Commissioner Tucker, in the first of the recent trilogy, pointed out that the "failure of the large eastern railroads to present evidence against consolidation is . . . a natural consequence of their own self-interest which dictates a reciprocity of silence." *C & O—Control, supra,* 317 I. C. C., at 326. The fact is that, despite some lip-service to the contrary,[29] the Commission has proceeded under the assumption that competitive impact is to be evaluated with the position of the railroads affected very much in mind. Thus the Examiners in this case, when called upon by the Justice Department to weigh the possibly serious adverse effect of Penn-Central upon N & W, C & O–B & O and others, pointed out that the roads allegedly affected had introduced no evidence of adverse effect. They added, realistically and revealingly:

> "We are fully cognizant of the fact that in the evolving merger picture in the northeast section of the nation, the carriers involved may well have refrained from participation in these proceedings or influenced their subsidiaries not to participate on the grounds that they did not desire to upset their own merger program. Such action, however, infers a managerial decision by each that the anticipated benefits from its individual merger program will

---

[29] The Commission said, for example, in the *C & O–B & O* case: "Notwithstanding Central's withdrawal from these proceedings, the effect of the proposed transaction on the operations and traffic of Central and other carriers is an issue to be considered." 317 I. C. C., at 280. It took insignificant steps, however, to resolve the conflicts of evidence concerning competitive impact upon Central, and failed entirely to weigh the combined effects on Central of both C & O–B & O and the pending N & W-Nickel Plate merger. See 317 I. C. C., at 319.

outweigh any injury or harm which may result from other merger plans." Penn-Central Report, at 304.[30]

The approach which this statement and many of the Commission's rulings and practices reveal is based upon a series of unacceptable assumptions. It is simply unrealistic, for example, to believe that all the railroads will always be correct in their estimate even of their own best interests. When a railroad has incorrectly estimated its self-interest, moreover, its reaction may well upset the private agreements or understandings upon which the Commission has in effect allowed its findings to rest. Thus when E–L realized that Penn-Central might be approved before it had secured voluntary inclusion in N & W, it abandoned its agreement with N & W, upon which the Commission relied, and petitioned for inclusion in Penn-Central, thereby setting into motion the controversy in this case. See 324 I. C. C., at 61–62 (representation of counsel quoted in dissenting opinion). Most recently, C & O–B & O, and their family lines, sought to reopen *Penn-Central* to introduce evidence of traffic diversion. The Commission observed, in refusing to hear the evidence, that the Examiners' findings that the net

[30] The District Court, in the *C & O–B & O* case, took basically the same position when, in rejecting the Justice Department's contention that the proceeding ought to be consolidated with others, it considered "significant" the fact that no railroad had joined the Department in its request and stated that self-interest would have required them to do so if the adverse impact was actually serious. 221 F. Supp., at 31. The Penn-Central Examiners were more accurate in their appraisal, since they impliedly recognized that the decision not to appear meant only that the road had decided the benefits from its own merger plans outweighed the disadvantages to it of another merger, and not that the railroad in fact contemplated no serious adverse impact upon itself.

effect of the merger would not be detrimental to these carriers or to their ability to provide adequate service "are as much based on a failure of the several petitioners to come forward with assertions or proof of injurious traffic diversion as on any affirmative showing of no effect." 328 I. C. C., at 317. For the first time revealing indignation toward a practice long condoned, the ICC stated that the "measured and deliberate silence" of the railroads at the hearing supports "the inference that they saw more to be gained thereby in their own system-building aspirations than would result from forceful opposition likely to arouse counter opposition. Now, with the N & W-Nickel Plate merger and the C & O–B & O control transactions safely beyond challenge, . . . petitioners have nothing to lose and perhaps much to gain by breaking their silence." *Ibid.*

Ultimately, however, the reason reliance upon the estimates of railroads of their own best interests is objectionable is simply that the best interests of the railroads are not necessarily consistent with the public interest, and it is the latter which the Commission is directed to advance. It may be, as Commissioner Tucker stated early in this "gigantic game of dominoes" the Commission has been playing, 327 I. C. C., at 550, "that each carrier has the unalienable private right to abdicate its prerogatives to oppose any consolidation. It is the primary responsibility of the Commission, however, to preserve the development of a sound transportation system in the public interest, and where an application may offer the possibilities of public injury, the Commission must strive to obtain a record which comprehensively covers public considerations." *C & O—Control*, 317 I. C. C., at 326. See generally, The Railroad Merger Problem, Report of the Subcommittee on Antitrust and Monopoly of the Senate

Judiciary Committee, 88th Cong., 1st Sess. (Comm. Print 1963). The commendable industrial statesmanship demonstrated by the railroads on many occasions in these recent proceedings only serves, because of the cohesion this demonstrates, see Jaffe, *op. cit. supra*, p. 405, at 11–13, to aggravate the danger that "grows out of the tendency of these giant corporations to compromise their own differences at the expense of the unorganized public," 2 Davis, *op. cit. supra*, n. 21, at 378. The regulatory agency must be the bulwark against such compromise. It is "a requisite for administrative viability," [31] that "[t]he outlook of the Commission and its powers must be greater than the interest of the railroads or of that which may affect those interests." *I. C. C.* v. *Chicago, R. I. & P. R. Co.*, 218 U. S. 88, 103. See *Scenic Hudson Preservation Conference* v. *F. P. C.*, 354 F. 2d 608 (C. A. 2d Cir.), cert. denied, 384 U. S. 941.

This merger may well be in the public interest, as well as in the interests of the railroads involved. But the Commission has failed to go about deciding this question in a manner designed to accomplish its statutory responsibility. "Deference to administrative decisionmaking assumes procedures which assure a fair hearing to the affected interests . . . ." Jaffe, *op. cit. supra*, at 566. "As soon as the search for the public interest, even seemingly, becomes a secondary consideration in cases involving more than the adjudication of private rights, no matter how conclusive the exigencies of the situation

---

[31] Huntington, The Marasmus of the ICC: The Commission, the Railroads, and the Public Interest, 61 Yale L. J. 467, 509 (1952). Compare Morgan, A Critique of "The Marasmus of the ICC: The Commission, the Railroads, and the Public Interest," 62 Yale L. J. 171 (1953).

appear, the independent Commission is doomed to impotency as an instrument of government." *C & O— Control,* 317 I. C. C., at 297 (dissenting opinion).[32]

MR. JUSTICE DOUGLAS, dissenting in part.

While I agree with the Court that the terms of the conditions which the Commission proposes to attach to this merger should be known before we approve it and while I join the opinion of the Court, I would go much further. There are underlying issues brought to us by a few of the parties which we should face. Those issues present not the merits of the merger but the adequacy of the Commission's findings. It is, of course, not for us to determine whether the merger is desirable or undesirable. We do not sit as a planning agency. Nor are we entrusted with the task of making the large policy decisions that underlie approval or disapproval of this new concentration of transportation power and wealth. Our task is one of review within the narrow confines of § 5 (2)(c) of the Act by which Congress has provided standards for the Commission. Our sole task is to determine whether the Commission has satisfied by its findings the standards provided by Congress. I do not think it has.

A word should be said as to the background of this irresponsible ICC decision. The Commission early indi-

[32] I find it surprising that my Brother FORTAS refers to today's decision as "a reversion to the days of judicial negation of governmental action in the economic sphere." In those days the Court took a restricted view of the power of Congress and its agencies to regulate our economy. That view "has long since been discarded." *Ferguson* v. *Skrupa,* 372 U. S. 726, 730. Our position today, shared by the Solicitor General and the Department of Justice, is not one of judicial negation but of insistence that the ICC fulfill Congress' directive to supervise in the public interest the destiny of this Nation's transportation system.

APPENDIX A TO OPINION OF BRENNAN, J.

THREE SYSTEM EASTERN DISTRICT, WITH SMALLER LINES INCLUDED IN PENN-CENTRAL

Legend:

Penn
Central
B & M
E & L
D & H
N.H.

N & W
C & O
B & O
W.M.
Reading
C N J

Scale of Miles
0  20  40  60  80  100.

APPENDIX B TO OPINION OF BRENNAN, J.

TWO SYSTEM EASTERN DISTRICT, SHOWING N & W MERGED INTO C & O - B & O

Legend:

Penn
Central
N.H.

C. & O
B. & O
N & W
W.M.
Reading
C N J
D & H
E & L

Scale of Miles
0  20  40  60  80  100

cated its preference for a consolidation of most eastern rail carriers into three systems: (1) C & O–B & O; (2) N & W-Nickel Plate; (3) Penn-Central. The initiative was left to the carriers. The Commission never sought, proposed, or examined into a master plan. On June 27, 1960, it indeed denied a petition of New York Central requesting the Commission "to embark upon a general investigation of the unification, consolidations, and mergers of the rail carriers within Central Freight and Trunk Line Association territories" with a view to formulating "principles by which both [the Commission] and the carriers shall be governed in Section 5 cases in the future." [1] The making of mergers was based upon "attainable" alliances rather than upon "any truly balanced competitive basis." [2] Today's predicament was prophetically forecast only a few years ago: [3]

> "Although superior lineups may exist, it is suggested that it is better to have 'attainable mergers' (approved by the big financial interests) rather than none at all. However, the helter-skelter method by which these mergers have become 'attainable' for decision has developed into a complicated problem

---

[1] Petition of the New York Central R. Co., Docket No. 33475. Prior to the Transportation Act of 1940, it was the duty of the Commission under § 5 to prepare "a plan for the consolidation" of the railway systems "into a limited number of systems." The 1940 Act relieved the Commission of that duty. H. R. Rep. No. 1217, 76th Cong., 1st Sess., 6. See *Schwabacher* v. *United States*, 334 U. S. 182, 192; *County of Marin* v. *United States*, 356 U. S. 412, 417. But there is no indication that Congress deprived the Commission of the power to propose one, though its power to enforce one proposed by it in a § 77 reorganization was denied by *St. Joe Paper Co.* v. *Atlantic Coast Line R. Co.*, 347 U. S. 298, by a narrow four-to-three vote.

[2] The Railroad Merger Problem, Report of the Subcommittee on Antitrust and Monopoly of the Senate Judiciary Committee, 88th Cong., 1st Sess., 31 (Comm. Print 1963).

[3] *Id.*, at 31–32.

for the Commission, particularly in the East. The eastern story begins with the Commission's approval of the merger between the Norfolk & Western and the Virginian in 1958, two successful and competitive coal roads. By that merger, the New York Central lost its access to the Pocahontas coal territory and it lost a friendly connection which more or less had always been considered a Central road. Thus the Virginian, apparently not 'attainable' by the Central was now placed in a position to enhance the competitive power of the Pennsylvania (which controlled the Norfolk & Western). This merger, plus the announced intention of the Chesapeake & Ohio to acquire control of the Baltimore & Ohio, sharpened the Central's interest in its competitive survival against the massive Pennsylvania system which was well entrenched in the rich Pocahontas coalfields and in the Tidewater ports. The Central tried to out-point the C & O in getting control of the B & O, but it lost out, largely because it couldn't convince Swiss bankers of any financial advantage in the merger. Then the Central negotiated with the C & O for a three-way merger between the respective companies, which the Central's president Perlman believed would provide a balanced, competitive system with the Pennsylvania. At the same time, Mr. Perlman was stating that a B & O-C & O union would seriously hurt the Central. In the meantime, the Norfolk & Western had filed for merger with the Nickel Plate, for a leasing of the Wabash, and for the purchase of the Pennsylvania's Sandusky line. This was apparently the last straw for the Central. It had been outmaneuvered, and thus did the only thing left it could do—agree to merge with the Pennsylvania. That merger was 'attainable,' and is now the crucial determinant of most rail reorganizations."

The Commission denied requests to consolidate the eastern consolidation proceedings for decision. See *Chesapeake & Ohio R. Co.—Control—Baltimore & Ohio R. Co.,* 317 I. C. C. 261, 266; *Norfolk & Western R. Co. and New York, Chicago & St. Louis R. Co.—Merger,* 324 I. C. C. 1, 19.

The Commission's piecemeal, hands-off approach to the merger problem is, however, not commanded by the Transportation Act of 1940. There is no evidence that Congress intended to remove entirely the planning and policy function of the Commission with respect to rail consolidations. Indeed, such a position ignores the mandate of the preamble to the Act of 1940, which provides that its provisions shall be administered with a view to "promote . . . adequate, economical, and efficient service and foster sound economic conditions in transportation and among the several carriers; . . . all to the end of developing, coordinating, and preserving a national transportation system." As my Brother BRENNAN notes, the 1940 Act significantly broadened the Commission's responsibility; it would be "incongruous to assert that the cha᛫᛫ge from the 1920 Act approach to that of the 1940 Act signifies a change from planning to strictly *ad hoc* adjudication." *Ante,* p. 427. The Commission has ample authority to insure a co-ordinated approach to railroad consolidations; it is not straitjacketed by a disjointed case-by-case approach. Yet the contrary attitude of the Commission is evident in this case. The Department of Justice argued that the eastern district should be served by four systems: Penn, Central, C & O–B & O, and N & W into which E–L should be merged. If it was shown that the traffic could not support four systems, the Department proposed that Penn should be consolidated with N & W and Central with C & O–B & O. The Commission's answer to this was that it could not compel the alignments suggested by the Department of Justice

and was limited to alignments suggested by the carriers. This suggests, as my Brother BRENNAN indicates, a subservience of the Commission to the railroads' estimates, the railroads' proposals, the railroads' evaluations, the railroads' prophecies of the future.

The C & O–B & O merger was approved, 317 I. C. C. 261, sustained, 221 F. Supp. 19, aff'd *per curiam* 375 U. S. 216. The N & W-Nickel Plate merger was approved, 324 I. C. C. 1; but its legality was not litigated. This is the first time the question of legality has been presented to this Court after full argument.

Now the "panic button" is being pushed here; and we in turn are being asked to act hurriedly and become the final instrument for foisting this new cartel on the country. Some cases generate great pressures on the Court. Mr. Justice Holmes once remarked that those cases make "bad law." *Northern Securities Co.* v. *United States,* 193 U. S. 197, 400. "For great cases are called great . . . because of some accident of immediate overwhelming interest which appeals to the feelings and distorts the judgment. These immediate interests exercise a kind of hydraulic pressure which makes what previously was clear seem doubtful, and before which even well settled principles of law will bend." *Id.,* at 400–401. We should, I submit, decline the present invitation.

We are here concerned with § 5 (2)(c) of the Act which governs railroad mergers and provides:

> "In passing upon any proposed transaction under the provisions of this paragraph, the Commission shall give weight to the following considerations, among others: (1) The effect of the proposed transaction upon adequate transportation service to the public; (2) the effect upon the public interest of the inclusion, or failure to include, other railroads in the territory involved in the proposed transaction; (3) the total fixed charges resulting from the pro-

posed transaction; and (4) the interest of the carrier employees affected."

The four items listed are not exclusive but only exemplary for they are only "considerations, among others."

The Commission's decision omits findings on many critical questions, all of which are, I think, relevant if the statutory ingredients of the public interest are to be evaluated under § 5 (2)(c).

Mr. Justice Brandeis, writing for the Court in *United States* v. *B. & O. R. Co.*, 293 U. S. 454, 464, emphasized that basic findings cannot be "left entirely to inference." Mr. Justice Cardozo emphasized the point again in *United States* v. *Chicago, M., St. P. & P. R. Co.*, 294 U. S. 499, 511, saying, "We must know what a decision means before the duty becomes ours to say whether it is right or wrong." More recently we emphasized the necessity of findings to responsible judicial review:

"Congress has also provided for judicial review as an additional assurance that its policies be executed. That review certainly entails an inquiry as to whether the Commission has employed those statutory standards. If that inquiry is halted at the threshold by reason of the fact that it is impossible to say whether or not those standards have been applied, then that review has indeed become a perfunctory process. If, as seems likely here, an erroneous statutory construction lies hidden in vague findings, then statutory rights will be whittled away. An insistence upon the findings which Congress has made basic and essential to the Commission's action is no intrusion into the administrative domain. It is no more and no less than an insistence upon the observance of those standards which Congress has made 'prerequisite to the operation of its statutory command.' *Opp Cotton Mills, Inc.* v. *Administrator*, 312 U. S.

126, 144. Hence that requirement is not a mere formal one. Only when the statutory standards have been applied can the question be reached as to whether the findings are supported by evidence." *United States* v. *Carolina Carriers Corp.*, 315 U. S. 475, 489.

Many crucial issues, necessary for evaluation by the Commission, are not even exposed in this record, let alone appraised. The absence of these findings makes judicial review impossible.

What is the nature of this cartel? What financial interests control it? Only one of the largest stockholders in the applicants is known. The remaining largest stockholders are brokerage houses and Swiss banks holding nominal title for their customers. The beneficial owners are unknown, and apparently of no concern to the Commission. The Commission was specifically requested to determine who are the beneficial owners of the stock and who would control the merged company. The Commission refused to accede to the request. Nor did the Commission consider it relevant that, through interlocking directorates, the proposed directors of the merged company are directors of and interested in corporations which deal with the railroads or that the control of railroads is steadily being concentrated in the hands of banks, insurance companies, and other large financial interests.

What effect on other roads within the area served by these carriers will result from the merger? What effect on rail competition outside the area will result? What will be the effect on the towns served by the two roads? Will some dry up? Will the community dislocations be offset by tangible gains?

None of these questions is answered by the Commission. Yet § 5 (2)(c) of the Act, which governs railroad

mergers, demands findings on the various ingredients of the public interest.

Concededly, community dislocations are relevant to the public interest. For the Commission considered them crucial in concluding that this merger would not be approved unless the New Haven were included.[4] What is the need of the New Haven? Its need is mirrored in the economic well-being of the New England States. With a rundown carrier, how can they attract new factories? Without new factories how can their employment needs be met?

If these basic community needs are relevant in the case of the New Haven, why are they not relevant when we turn to the needs of the communities served by the other roads which are about to be merged? We are told that the three mergers mentioned, including the present one, will result in many communities being reduced "from main line to secondary line status"—a condition "particularly true with respect to the merger between the Pennsylvania and New York Central when most of the New York to western gateway traffic will be routed over the Central's northern route." [5]

The healthy small towns stretched along these railroads may be more important in terms of the "public interest" than the profit and loss statements of the carriers, or the market prices of their securities, or the power of the small oligarchy that will sit at the head of this behemoth that will be turned loose. Rail mergers are only one form of regional planning. And whatever the attitude of the Commission may have been, it cannot in light of § 5 (2)(c) delegate that duty to the carriers or become

---

[4] ". . . [W]e find that this merger, without complete inclusion of NH, would not be consistent with the public interest, and, accordingly, we will require all the New Haven railroad to be included in the applicants' transaction." 327 I. C. C. 475, 524.

[5] Report, *supra*, n. 2, at 14, n. 52.

their rubber stamp or fail to relate to the standard of the "public interest" the impact of the merger on the various communities served by these lines.

The Commission in its report gave practically its entire consideration to two aspects of the merger. The first dealt with the financial needs of the two carriers and on this the Commission concluded that the new company would have the financial strength and power and resources to deal with all the difficult contingencies in the years ahead. The second main consideration related to the problem of competition within the region served by the two roads. The Commission indicated that, although there will be less competition, the improved transportation service was a justified price to pay for that loss.[6]

---

[6] The reasons usually advanced in support of railroad mergers are: (1) consolidations will improve the ailing financial condition of the constituents; (2) consolidations will result in a reduction of cost of operations; (3) consolidations will improve service capability. The premises underlying these justifications have been seriously questioned. It has been suggested that the financial condition of the industry is not as poor as merger applicants suggest. See, e. g., Keyserling, The Move Toward Railroad Mergers 72–74 (1962); The Railroad Merger Problem, Report of Subcommittee on Antitrust and Monopoly of the Senate Judiciary Committee, 88th Cong., 1st Sess., 49–54 (Comm. Print 1963). Some have maintained that the wave of railroad mergers, and the resulting contraction of physical plant, will impair rather than improve the roads' financial condition and dampen the Nation's economic development. See, e. g., Keyserling, supra, at 75–78. Others have noted that the present condition of the industry is due to a multitude of causes, and that solutions must strike at the roots of the problem rather than accept the temporary palliative of merger. See, e. g., Nelson, Railroad Transportation and Public Policy 327–435 (1959); Meyer, Peck, Stenason & Zwick, The Economics of Competition in the Transportation Industries 242–273 (1959); National Transportation Policy, S. Rep. No. 445, 87th Cong., 1st Sess., 67–71 (1961). It has been suggested that massive alignments may result in serious diseconomies, not in the savings predicted by their proponents. See, e. g., Healy,

Yet one who reads the report and reflects on these two considerations and their treatment by the Commission, cannot help but wonder why they would not justify any conceivable merger—all the southern roads and eastern roads—all the eastern roads and the western roads—or the western and southern and southwestern roads so that we would end up with one or two rail transportation systems. I put the matter that way because the arguments of the Commission are so generalized and so obviously mere rationalizations that they could easily apply to any merger; for the theory of all promoters of mergers, as Mr. Justice Brandeis exposed many years ago,[7] is to justify mergers by increased financial power and improved service.

.The size and power of the new company will be awesome, and some say excessive. *It has been estimated that the new company will account for 51% of the assets, 50% of the trackage, 52% of the operating revenues, 75% of the revenue passenger miles, and almost 53% of the railroad employees in the eastern area.* The combine will be almost twice as large as the next system and three times as large as the third system. Some experts have concluded that the new company will have a dominant position with respect to the negotiation of rates and its relations with the public and government, to the detriment of other railroads and other modes of competition. It will have a vast amount of power over the decisions of the Association of American Railroads with respect to rail transportation policy. Its power will extend well beyond the eastern district. The Railroad Merger Problem, Report of the Subcommittee on Antitrust and Monopoly of the Senate

---

The Effects of Scale in the Railroad Industry (1961). The Commission does not address itself to these problems.

[7] See Brandeis, The Curse of Bigness 185 *et seq.* (1935).

Judiciary Committee, 88th Cong., 1st Sess., 8–9 (Comm. Print 1963).

The routes of the applicants parallel each other through their respective systems and have many common points. They serve many communities and areas in common, and in several one or the other is the sole road; in others the applicants alone compete. . The Commission realizes that the merger will eliminate the existing choice for many shippers and communities. It downgrades the severity of the impairment of competition. And the Examiners' Report frankly takes the position that interrailroad competition is not very important because the industry is characterized by oligopoly, rendering price competition nonexistent and service competition unimportant.[8] The Commission thinks that intermodal competition will prevent the new company from misusing its tremendous size and power,[9] even though it recognizes that the rail-

---

[8] Cf. Conant, Railroad Mergers and Abandonments 25–40 (1964); Conant, Railroad Consolidations and the Antitrust Laws, 14 Stan. L. Rev. 489, 490–495 (1962).

[9] It is argued that intermodal competition is not sufficient to protect the public interest, that intramodal competition is necessary to insure progress, efficiency, and lower prices. Only the firms in the same industry have the same cost structures and products. Thus, no firm has a sheltered market due to inherent advantages over other firms, a condition which obtains when competition is only intermodal. Meyer, Peck, Stenason & Zwick, The Economics of Competition in the Transportation Industries 240–241 (1959). Further, the position that intermodal competition is sufficient to protect the public interest ignores the fact that the number of regulated trucking lines on important routes is rapidly decreasing, due to entry control and mergers in the motor carrier industry. If the present trend continues, we may soon see a very limited number of firms— perhaps one from each mode—serving any given route. If that happens, the possibilities of oligopolistic lessening of competition without explicit rate and market agreements is likely. See Chamberlin, Theory of Monopolistic Competition 46–53 (1956).

roads have an inherent advantage in transportation of bulk and long-haul traffic. The Examiners' Report and the Commission's opinion suggest that competition among railroads, rather than being the norm, is to be avoided because it is "inefficient." Comparing the Commission's handling of the competitive effects of this merger with its treatment of the competitive effects of the proposed Great Northern Railway Company-Northern Pacific Railway merger gives one the impression that the cases were decided by different regulatory bodies rather than the same commission. In the Great Northern case the Commission was sensitive to the anticompetitive effects of the merger and recognized that competition is necessary to protect the public interest. The Commission also noted that intermodal competition is not enough to furnish the impetus for lower prices and increased service, especially with respect to low-rated bulk shipments and long-haul traffic. See *Great Northern Pacific & Burlington Lines, Inc.—Merger—Great Northern R. Co.,* —— I. C. C. ——.

These problems apparently bother the Commission because in spite of its findings concerning the improved financial position of these two carriers and the improved transportation system even with the loss of competition, it nonetheless refused to approve the merger *unless the New Haven road, which is in a notoriously desperate condition, is included.* So what the Commission in effect is saying is that the increased financial prowess of the new company and the improved transportation service are themselves not enough to satisfy § 5 (2)(c) of the Act. What satisfies § 5 (2)(c) of the Act apparently is the opportunity to salvage the New Haven situation. This, I admit, is a relevant consideration if there is to be a merger. But if salvaging the New Haven so as to maintain the economy of New England is rele-

vant,[10] then what about the economy of the cities and counties stretched along the lines of these two roads which will be merged? What degree of obsolescence will they suffer?

Railroads are critical factors in the production and distribution of goods and in the supply of materials. They are still the basic transporters of low-cost, bulk goods and long-haul merchandise. Their rates and efficiency of service affect industrial competition. Adequate railroad transportation, at reasonable costs, is essential to the economic development of any region or area. The

---

[10] The facts are detailed in the Examiners' Report. The plight of Rhode Island is typical:

"N. H. is the only Class I railroad serving the State of Rhode Island. Over 50 percent of the population in Rhode Island are employed in the manufacturing industry and such industry is greatly dependent upon rail service provided by N. H., particularly for the inbound movement of raw materials from points outside of New England. In 1962, 35,000 cars were consigned to or shipped by industries located in Rhode Island via N. H. from which the latter derived $5,000,000 in revenue. Three important naval stations in Rhode Island are located at Newport, Quonset Point and Davisville, and in the Narragansett Bay area, the naval installations employ over 10,000 civilians. In addition to freight service, the N. H. provides an important passenger service in the State, and estimates indicate that approximately 1,200,000 passengers utilizing rail service originate or terminate within the confines of this State annually. Providence, a city with a population of 200,000 and Metropolitan Area of 1,000,000, has water facilities to receive shipments of bulk commodities, but since World War II general freight service by water to and from Providence has been discontinued.

"The Governor of Rhode Island evidenced his concern at the hearing that the failure to include the N. H. in the proposed merger may result in a loss of service provided by N. H. in the State. It was his belief that without such service, the State would have little chance of attracting new industry; that existing industries might relocate their plants and that without rail service, the Federal Government may well determine to reduce or terminate existing defense installations. . . ." Report, at 278.

curtailment of rail transportation is bound to have an adverse effect on the areas and communities which rely on railroads to service industry upon which their economic health is dependent. Many communities along the lines are dependent upon the employment furnished by railroads. What will the effect of this merger be on these communities? Will industry locate elsewhere because of inadequate rail transportation? Will the firms located in the region cease to expand or move to other areas? Will decreased employment opportunities mean that the residents of these towns must move elsewhere, thus creating more of the ghost towns which we already see along many of the trunklines? None of these questions is even considered by the Commission. After a very generalized discussion, the Commission concluded that the merger would not seriously impair Pennsylvania's economic health. But this "finding" is foreshadowed by the Commission's expressed view that railroads have little if any responsibility in furthering the economic development of an area and by the Examiners' position that the Commission need not consider the employment, tax, and developmental effects of the merger. And what about the other States and communities so vitally interested in the effects of this combination? The Commission's opinion is totally unenlightening. The Examiners' Report is no better. It contains a long list of interesting statistics, on a state-by-state basis, but makes no attempt to evaluate the effects of the combination.[11] Compare Stan-

---

[11] The Commission's own Bureau of Transport Economics and Statistics has recognized the importance of community dislocations in evaluating the "public interest" aspects of a proposed merger. "[T]he Commission should consider the local and regional impact of consolidations, economically and socially, as a separate criterion or sub-criterion in its decisions . . . . Separate consideration of local effects would have the merit of affording opportunity for the Commission to distinguish and determine the relative importance

ford Research Institute, Selected Impacts of Railroad Mergers (1965).

This merger, like the ones preceding it, apparently is a manipulation by financiers and not a part of regional planning which is the ultimate function of the Interstate Commerce Commission. Yet if the imprimatur of the Commission is to be put on the plans of the financiers much more should be known about them. What interests will control the new company?˙ How powerful will those interests be? Are the interests which will control the new company antagonistic to the basic interests of the region being served? Is the Commission putting its imprimatur on a new form of banker-management of rail carriers that was so disastrous to the New Haven and that Mr. Justice Brandeis exposed in Other People's Money 129–136 (1933)?

The New Haven Railroad is indeed an excellent example of manipulation at the hands of financial interests rather than management by railroad operators. Mr. Justice Brandeis said:

"The rise of the New Haven monopoly presents another striking example of combination as a developer of financial concentration; and it illustrates also the use to which 'large security issues' are put.

"In 1892, when Mr. Morgan entered the New Haven directorate, it was a very prosperous little railroad with capital liabilities of $25,000,000 paying 10 per cent dividends, and operating 508 miles of line. By 1899 the capitalization had grown to $80,477,600, but the aggregate mileage had also grown (mainly through merger or leases of other lines) to 2017. Fourteen years later, in 1913, when Mr. Morgan died

---

of such factors." Railroad Consolidations and the Public Interest, Staff Report of Bureau of Transport Economics and Statistics 72 (1962).

and Mr. Mellen resigned, the mileage was 1997, just 20 miles less than in 1899; but the capital liabilities had increased to $425,935,000. . . . [A]dditional issues were needed, also, because the company paid out in dividends more than it earned. . . . [O]f the capital increase, over $200,000,000 was expended in the acquisition of the stock or other securities of some 121 other railroads, steamships, street railway-, electric-light-, gas- and water-companies. It was these outside properties, which made necessary the much discussed $67,000,000, six per cent, bond issue, as well as other large and expensive security issues. For in these fourteen years the improvements on the railroad including new equipment have cost, on the average, only $10,000,000 a year." *Id.*, at 121–122.

"[T]he most grievous fault of this banker-managed railroad has been its financial recklessness— a fault that has already brought heavy losses to many thousands of small investors throughout New England for whom bankers are supposed to be natural guardians. In a community where its railroad stocks have for generations been deemed absolutely safe investments, the passing of the New Haven . . . dividends after an unbroken dividend record of generations comes as a disaster.

"This disaster is due mainly to enterprises outside the legitimate operation of these railroads; for no railroad has equaled the New Haven in the quantity and extravagance of its outside enterprises. . . .

"Close scrutiny of the transactions discloses no justification. On the contrary, scrutiny serves only to make more clear the gravity of the errors committed. Not merely were recklessly extravagant acquisitions made in mad pursuit of monopoly; but the financial judgment, the financiering itself, was conspicuously bad." *Id.*, at 130–131.

The years passed, the New Haven emerged from bankruptcy reorganization, and in 1954 Patrick B. McGinnis won a proxy fight for control of the road and became president. His group owned very little preferred stock; but in order to pay dividends on the common, in which he was heavily interested, he first had to pay cash dividends on the preferred. These cash dividends were paid out in very large amounts, the record showing the following:

1954 ........................ $3,440,180
1955 ........................ 2,457,700

At the same time, maintenance outlays were severely cut. Total outlays for maintenance of ways and structures dropped from $27,641,046 in 1953, to $19,647,313 in 1954, to $18,338,714 in 1955. Total maintenance of equipment decreased from $24,306,984 in 1953, to $22,794,715 in 1954, to $21,933,318 in 1955.

It is estimated that this cabal of financial interests lost $7,000,000 of the railroad's money in 20 months. Cash reserves dwindled, current liabilities mounted, as did long-term debt. "It's a stock speculation venture instead of a railroad business" said one director. Time, January 30, 1956, p. 76.

Is the new Penn-Central Company also to be milked by predatory finance?

Alternatively, if a regime as big and as powerful as this is to be turned loose, should it stay in private hands? How big can an enterprise of this character get without stepping over into the public domain? "How far should the consolidations be allowed to go before they cross the threshold of private enterprise and enter the domain of *private* government?" [12] Is the power and the control so

---

[12] Report, *supra*, n. 2, at 80.

great that we should think in terms of public ownership [13] rather than private ownership?

These considerations go to the very vitals of § 5 (2)(c) of the Act and none of them is answered. They are emphasized by the apparent worry in the mind of the Commission that in spite of all the arguments for the merger that it could advance, it decided not to approve it unless the New Haven was bailed out. Bailing out the New Haven may be very important in the public interest, as I have said. But in the context of these modern mergers there is the terrible spectre that the Federal Government may be creating new Frankensteins who will be running the country in a way that people can ill afford.

The alarm is increased by the Commission's default as respects the other eastern rail carriers. There are three so-called "protected" roads—Erie-Lackawanna, Delaware & Hudson, and Boston & Maine. The Commission found that this merger would destroy those three as independent railroads and proposed the imposition of protective conditions. What those protective conditions will be we do not know. If they include a capital indemnity, the "protected" lines will in substance disappear from the competitive scheme. Should competition be bought off in that manner?

Should the three "protected" carriers go into this Penn-Central merger and create a monopoly of rail

[13] Some experts have suggested that the trend toward railroad consolidations, which may result in the Nation's dependence upon mammoth combines with excessive power, may be a prelude to nationalization of the industry. See, e. g., Meyer, Peck, Stenason & Zwick, The Economics of Competition in the Transportation Industries 260 (1959); Rail Merger Legislation, Hearings before the Subcommittee on Antitrust and Monopoly of the Senate Judiciary Committee, 87th Cong., 2d Sess., 15 (1962) (testimony of Professor Kent T. Healy).

transportation east of Buffalo and north of New York City? The Commission has never made any effort even to consider whether such an inclusion in Penn-Central would be in the public interest.

There are suggestions that perhaps the three "protected" lines belong in the N & W-Nickel Plate system. In that merger it was recognized that E–L was a logical addition but that inclusion on equitable terms was not possible because of E–L's poor financial condition. 324 I. C. C. 1, 22. The Commission therefore reserved jurisdiction to give E–L five years to improve its financial position to become eligible for inclusion in N & W on equitable terms. 324 I. C. C., at 28–29.[14] The Penn-Central merger has frustrated this purpose by threatening the very survival of E–L, D & H and B & M as independent roads. If they are not to become members of the Penn-Central system, their only alternative seems to be inclusion in N & W. The failure of the Commission to consolidate these cases raises the distinct possibility that the three "protected" carriers may not be included in any system, and being unable to withstand the pressure of the Penn-Central, will be destroyed. As my Brother BRENNAN points out, the inclusion of these roads in the N & W system is no less risky than their inclusion in the Penn-Central system.

The question whether the Penn-Central merger is in the "public interest" therefore cannot be resolved until the fate of these three protected roads is determined.

---

[14] On December 22, 1966, Commissioner Webb of the ICC recommended that the Commission direct inclusion of the E–L and D & H, and authorize inclusion of the B & M in the N & W. The Commissioner perceptively noted that, "Unfortunately, the Commission's action in deciding the (Penn-Central and N & W-Nickel Plate) cases separately has tended to blur vital issues common to both proceedings." *Norfolk and Western R. Co. and New York, C. & St. L. R. Co., Merger,* Finance Docket No. 21510, p. 23.

They too have stockholders and bondholders. They too service shippers, consumers, and communities. They too are an important part of the competitive system in the East. The truth is that before the Commission can exercise an informed judgment on the Penn-Central merger, it must deal with the serious impact which this merger will have on the three "protected" carriers.

There are also seven unprotected eastern rail carriers whose future is in doubt. Their fate is emphasized anew by a new merger application now pending before the Commission. As I have said, the Commission has promoted three systems in the East—the C & O, the N & W, and Penn-Central. Now the C & O and N & W have applied for approval to merge. This proposal would include the three "protected" roads I have mentioned. It would also include Central of New Jersey and Reading. Hearings on that merger will commence April 17, 1967. If that merger is approved, we will have two huge eastern rail cartels rather than three.

Was the creation of the new Penn-Central behemoth the reason for the desire to create this second one?

What will happen to both the three "protected" lines and the seven unprotected ones under a regime of two eastern cartels? Where will they best fit to maintain as much of a competitive system as possible?

No one at present can say because the entire merger problem of the East is nowhere near solution. Until the total plan is known, an informed decision is impossible. The Commission does not even know what effect the inclusion of NH will have on Central of New Jersey which claims that the inclusion of NH should not be authorized, unless CNJ is at least included in one of the new large systems. Under § 5 (2)(c) the Commission is required to consider "the effect upon the public interest of the inclusion, or failure to include, other railroads in the territory involved in the proposed transaction." In

*McLean Trucking Co.* v. *United States,* 321 U. S. 67, 87, we stated that the Commission has the duty "to consider the effect of the merger on competitors and on the general competitive situation in the industry."

Its default in that regard is conspicuous here. Those required findings cannot be made until a master plan or plans for the East are designed and the place of each rail carrier in the new system is finally rationalized and determined.

The Commission has now approved three privately planned mergers embracing over 85% of the railway operating revenues in the entire eastern railroad market. The unresolved but crucial question is whether the remaining roads can survive as presently constituted; or if they cannot, how they can best be restructured to promote competition against one or more of the new merger systems.

The case must be remanded to the Commission so that the competitive regime of the East under two or three or four or five rail cartels can be determined. The impact on the communities of the region must be determined. The competitive balance of the several combines must be appraised. The position of each rail carrier in the new picture must be established. And the financial hierarchy of the new cartels must be exposed so that the centers of control will be known. Only when all these facts are known can the Commission make the required findings under § 5 (2)(c). Only then will judicial review of a responsible kind be possible. It is only when the required findings are made that we will be able to know what the Commission's opinion really means and to determine whether the statutory standards have been met. See *United States* v. *Carolina Carriers Corp.,* 315 U. S., at 480–489.

We should say here what we said in *Securities and Exchange Commission* v. *Chenery Corp.,* 318 U. S. 80, 94,

"The Commission's action cannot be upheld merely because findings might have been made and considerations disclosed which would justify its order as an appropriate safeguard for the interests protected by the Act. There must be such a responsible finding. . . . There is no such finding here."

I would reverse the lower court and remand the cases to the Commission not only to spell out the terms and conditions specified by the Court but also to make the necessary findings on the reach and merits of the merger as required by § 5 (2)(c) of the Act.

MR. JUSTICE FORTAS, with whom MR. JUSTICE HARLAN, MR. JUSTICE STEWART and MR. JUSTICE WHITE join, dissenting.

For more than 45 years it has been the national policy, reflected in congressional legislation, that the railroads of this country should be combined into a limited number of systems. The policy gained acceptance in 1919, when, following World War I, the Government was planning to return the railroads to private ownership and the frail condition of many of the smaller roads became apparent. The Transportation Act of 1920 directed the Commission to formulate a national master plan of consolidation pursuant to which, it was hoped, the railroads would submit voluntary plans for consolidation. The Commission did so, but the opposition to the program was overwhelming and the goal could not be achieved. In 1925 the Commission asked to be relieved of the burden of working out a national plan, but until 1940, its request did not result in congressional action. In that year, Congress enacted the Transportation Act of 1940, which remains in effect and governs the present proceedings. Under that Act, and in all of the years since 1919 or 1920, the national policy of effecting consolidations of the railroads into a limited number of systems has been un-

changed. Because of the failure of the technique author-
ized by the 1920 Act, Congress in the 1940 law abandoned
the idea of a formal national plan, and left the power
to initiate mergers and consolidations in the hands of the
carriers. The Commission became judge rather than
architect. See generally, *St. Joe Paper Co.* v. *Atlantic
Coast Line R. Co.,* 347 U. S. 298, 315–321 (Appendix)
(1954).

The 1940 Act expressly provided that two or more
carriers could merge or otherwise combine management,
ownership, and operation if the approval of the ICC
were obtained. The key provision, which basically gov-
erns the present case, is § 5 (2): "If the Commission
finds that, subject to such terms and conditions and such
modifications as it shall find to be just and reasonable,
the proposed transaction is within the scope of subdi-
vision (a) of this [section] and will be consistent with
the public interest, it shall enter an order approving and
authorizing such transaction, upon the terms and con-
ditions, and with the modifications, so found to be just
and reasonable . . . ." § 5 (2)(b). Among the considera-
tions to which the Commission is to give weight are:
"(1) The effect of the proposed transaction upon ade-
quate transportation service to the public; (2) the effect
upon the public interest of the inclusion, or failure to
include, other railroads in the territory involved in the
proposed transaction; (3) the total fixed charges resulting
from the proposed transaction; and (4) the interest of
the carrier employees affected." § 5 (2)(c). Jurisdiction
"to enforce, enjoin, set aside, annul or suspend, in whole
or in any part, any order" of the ICC, is vested in the
district courts by 28 U. S. C. § 1336. It is clear, beyond
argument—one would confidently assert prior to today's
decision—that whether particular railroad mergers serve
the public interest, including the antitrust ingredient, is
to be judged by the standards of the Transportation

Act of 1940 as applied initially by the ICC, and not by this Court.

Under the 1940 Act, the Commission's judgment is not to be governed by the antitrust laws. As this Court said in *McLean Trucking Co.* v. *United States,* 321 U. S. 67, at 84–85 (1944), there is "little doubt that the Commission is not to measure proposals for all-rail . . . consolidations by the standards of the anti-trust laws." In the last Term of Court, a decision of a three-judge district court setting aside ICC approval of a merger was reversed by this Court in a *per curiam* decision, quoting the above statement from *McLean Trucking,* because the District Court applied antitrust standards to overturn the ICC decision. *Seaboard Air Line R. Co.* v. *United States,* 382 U. S. 154 (1965). In that case, the Court said: "It matters not that the merger might otherwise violate the antitrust laws; the Commission has been authorized by the Congress to approve the merger of railroads if it makes adequate findings in accordance with the criteria quoted above that such a merger would be 'consistent with the public interest.' " 382 U. S., at 156–157.

Until recently, despite the provisions of the 1940 Act, little was accomplished to effectuate the national policy of combining roads into a few major systems. The conflicts and rivalries, the overlaps of conflicting needs and ambitions are so great that the task is formidable and, from time to time, has appeared hopeless. Finally, in 1962, the ICC approved the C & O's acquisition of control of the B & O.[1] In 1964, it approved the combination of the N & W and the Nickel Plate.[2] And, after more than 10 years of elaborate corporate maneuvering and

---

[1] 317 I. C. C. 261, sustained *sub nom. Brotherhood of Maintenance of Way Employees* v. *United States,* 221 F. Supp. 19 (D. C. E. D. Mich.), aff'd, *per curiam,* 375 U. S. 216 (1963).

[2] 324 I. C. C. 1.

negotiating, in 1962 the Pennsylvania and the New York Central Railroads filed with the ICC their proposal to merge. Lengthy administrative proceedings followed, and it was not until April of 1966 that the ICC rendered its final decision, approving the merger subject to conditions. *Pennsylvania R. Co.-Merger-New York Central R. Co.,* 327 I. C. C. 475. It modified those conditions on September 16, 1966. 328 I. C. C. 304. If the Penn-Central merger becomes effective, the result will be three large systems, each operating in various and sometimes overlapping parts of the Northeast, middle Atlantic and midwestern States. The Commission's opinions in the three cases indicate its view that the consequences, at long last, will be a substantial measure of progress towards the goal successively announced in the transportation laws of 1920 and 1940.

The Penn-Central merger, as approved by the ICC, was attacked by various parties and a temporary injunction was sought in the Southern District of New York. The complainants included a number of railroads, several affected communities and one Milton Shapp. As the matter comes to this Court,[3] the only plaintiffs who complain about the merger itself are Shapp and the City of Scranton, Pennsylvania. Shapp, whose rather shaky standing to participate in these appeals is predicated upon his participation before the Commission and the bare circumstance that he is a shareholder in the Pennsylvania Railroad and a citizen of Pennsylvania, asserts here, as he did in the District Court, that in calculating the necessity for the merger and the benefits to be derived therefrom, the ICC relied upon an unwarrantedly pessimistic forecast as to railroad prospects, and that as a result it

---

[3] Other communities aligned themselves with the City of Scranton in the District Court, but have either declined to seek review or, as in the case of the Township of Weehawken, have abandoned their appeal.

has approved a transaction which will have serious anti-competitive effects in the East and will inflict economic harm upon the Commonwealth of Pennsylvania. A single community in Pennsylvania, the City of Scranton, concurs with Shapp's analysis and argues in addition that the merger and .expected inclusion of the E–L, D & H and CNJ in one or another system will reduce the quantity of rail service now available to Scranton, which is presently served by those three smaller roads. The United States, which questions the correctness of the procedure used by the Commission in protecting the E–L, D & H and B & M, does not challenge the merger itself. Indeed, the Solicitor General has represented to the Court that "the agencies of the Executive Branch that have substantive responsibilities for the formulation of economic and transportation policy believe that the merger is in the public interest and that its consummation should be promptly effected." [4]

None of the railroads objects to the merger itself as unlawful or unfair. None of the affected States objects. The Commonwealth of Pennsylvania which had at one point opposed the merger withdrew its opposition, and now urges approval of the ICC order. Vigorous attack, however, was and is launched upon the ICC's order by various of the railroads because of provisions in the order addressed to the complications arising from the situation of three smaller roads, the E–L, the D & H, and the B & M.

The three-judge District Court, in an opinion by Circuit Judge Friendly for himself and District Judge Levet, declined to issue a temporary injunction to enjoin the merger, Judge Weinfeld dissenting. 259 F. Supp. 964. This Court granted a stay and expedited the case for consideration. The Court today sets aside the ICC's order.

---

[4] Memorandum for the United States in Nos. 642, 680, 691, p. 21.

464

It expressly reserves any ruling upon the issue of the merits of the merger. It bases its decision entirely upon the alleged failure of the Commission to make adequate provision for the three smaller roads prior to authorizing consummation. In a separate opinion, MR. JUSTICE DOUGLAS concurs, but concludes that he would also hold the merger itself illegal and the Commission's approval unlawful for this reason. I respectfully dissent. I believe we should affirm the order of the District Court upholding the Commission's action.

Certainly, there is no tolerable basis for our attacking the merger on its merits. To do so would be to substitute our judgment for that of the Commission on grounds which, to say the least, are speculative and based upon the claimed superiority of competing economic considerations. We are not at liberty to do this, and if we were free to do so, it would require a high degree of intrepidity on such a basis to overturn a result which, even if we assume its imperfections, generally incorporates a significant step in a direction which national policy has sought for several generations. This is Congress' responsibility, and the task, not of the courts, but of Congress' designated instrumentality, the ICC. The national need to refurbish and revitalize rail communications is urgent—some say of desperate urgency. The ICC has found that the merger here will result in economies and efficiencies aggregating $80,000,000 annually by the eighth year, which it asserts will enable the roads to effect the badly needed modernization of their facilities. This may be a step in the wrong direction, as my Brother DOUGLAS argues; but we have neither the franchise to say so nor the power to do better.

The problem presented with respect to the three smaller roads assumes a different form. Here, it is urged that the Commission specifically failed to carry out its statutory duty and that the merger should not be con-

summated until its task is complete. The facts are as follows:

1. The three roads, the Commission has found, cannot survive without inclusion in one of the large, integrated systems. The Commission has assumed, as I shall describe, that they will be included in either the N & W or the Penn-Central systems. The three roads filed applications in both the N & W-Nickel Plate and the Penn-Central proceedings, for inclusion in the resulting system. They have indicated their preference for inclusion in the former. The Commission approved the N & W-Nickel Plate merger and its order has become final. It did not, however, pass upon the application of the three roads for inclusion. On the other hand, it made effective assurance for the subsequent determination of the issue and the effectuation of the result. Its order of approval provided that the ICC would retain jurisdiction for five years to require the N & W to include the three roads on terms that the ICC would itself prescribe in the absence of agreement, and it required the irrevocable consent of N & W to such order as a condition of consummating the merger. The N & W gave its consent. On December 22, 1966, pursuant to the reserved jurisdiction, Commissioner Webb of the ICC recommended authorizing inclusion of the three roads in the system.[5] It is anticipated that a Commission order will be entered by July 1 or August 1, 1967. When this order becomes final, if it provides for inclusion of the three roads in the N & W system, that will settle their ultimate fate and will terminate the significance of the conditions to which the Court herein objects and which have resulted in setting aside the ICC's order. It

[5] He recommended that the Commission "authorize and direct" inclusion of the E–L and D & H, and "authorize" inclusion of the B & M. *Norfolk and Western R. Co. and New York, C. & St. L. R. Co., Mergcr,* Finance Docket No. 21510.

must be remembered, however, that the Commission's order will be subject to judicial review; and if the past is a guide to prediction, the resulting proceedings will be long, complex, and bitter. In short, no one can say whether the three roads will find their ultimate home during this calendar year or the next.[6]

2. In the present proceeding, the ICC denied the request of the three roads for inclusion in the Penn-Central system, but it provided that if they were not included in the N & W system, they might resubmit the matter by supplemental petition. It is essential to note that no attack is made in this proceeding on these provisions relating to the ultimate fate of the three roads.

3. The ICC concluded that the three roads required some interim protection because "when the various consolidations of yards and equipment and the new through routes contemplated by the applicants are effectuated, a substantial amount of traffic could be diverted from E–L, D & H and B & M." Accordingly, it decided to impose certain conditions which I shall describe, and it required of the applicants "their acceptance of and active cooperation in the implementation of conditions" pending ultimate decision as to the inclusion of the three roads in a major system. In this connection, the Commission made the statement that has provided the basis of attack. It said: "It is doubtful that, without inclusion in a major system, these three carriers could withstand the competition of the applicants merged, and, unless they are protected during the period necessary to determine their future, we would not authorize consummation at this time, even though approving the merger." 327 I. C. C., at 531–532.

4. The conditions consisted of measures for (1) traffic maintenance, by temporary preservation of present prac-

---

[6] The court below speculated that the ICC should finish its work on the matter during calendar 1967. 259 F. Supp., at 969, n. 4.

tices and patterns; (2) indemnity payments to cover losses due to diversion of traffic, if any; and (3) procedures to determine disputes under these conditions. The Commission specifically provided, however, that notwithstanding the above, the applicants and the three protected carriers could enter into an agreement for alternate protections "which shall supersede the protection provided by such sections" if not otherwise violative of law. 327 I. C. C., at 563, App. G.

. 5. The three protected carriers complained that the conditions were not adequate for their protection and they specifically demanded, in addition to improvement of the traffic and indemnity provisions, an indemnification against capital impairment. On the other hand, a number of other roads attacked Appendix G on the ground that the indemnity provisions would induce manipulation and diversion of traffic by both Penn-Central and the three roads which would be harmful to them. All of them complained that there had been no hearing, and the nonprotected complainants alleged that the indemnity conditions really amounted to a pooling arrangement which should have been but was not considered under § 5 (1) of the Act.

6. On September 16, after the present suit had been filed, the Commission granted the various petitions to reconsider Appendix G. Pending hearing and decision on reconsideration, it rescinded the indemnity provisions but left in effect the traffic conditions subject to whatever modifications might be made. 328 I. C. C. 304. The Commission said that "Since the applicants have indicated willingness to accept post-merger modification of the protective conditions, they may proceed with consummation of the merger upon our authorization thereof becoming effective. Such consummation will constitute irrevocable assent on the part of the applicants to any modification resulting from the further consideration

herein described and ordered and which is found to be just and reasonable; as well as irrevocable agreement by the applicants to comply fully with the conditions as modified." On October 31, pursuant to this ruling, hearings were commenced on the interim protective conditions.

It is the ruling that the merger may be consummated in these circumstances that the Court finds objectionable and on the basis of which the Court halts this transaction which is concededly of major importance to the Nation. The Court reasons that the Commission's order as it now stands fails to implement its findings with respect to the three smaller roads, and unless and until it does so the merger may not be consummated.

Fundamentally, I submit, this is based upon a misconception of the ICC's findings. The Commission firmly and clearly held that, as a condition to consummation of the merger, it was necessary to assure that the three roads would be protected pending their inclusion in one of the larger systems. But it is clear that the Commission did not find that it was necessary to fix the terms of such protection prior to consummation of the merger. On the contrary, the Commission prescribed traffic and indemnity provisions in what must, in all fairness, be regarded as a tentative setting.

The prescribed conditions were, as the court below noted, "unprecedented in their severity in the history of railroad mergers." 259 F. Supp., at 969. They had not been focused or defined prior to the Commission's report for the apparent reason, understandable to anyone familiar with the administrative process, that they must have been crystallized in the post-argument deliberations of the Commission and its staff. They had not been included in the Hearing Examiners' report. The conditions are complex. Interim protection of the three roads against possible traffic diversion and resulting financial

loss depends upon future events which are unknown and largely unknowable. A vast realignment of the sort involved here always has elements of the unique, and only a doctrinaire approach, separated by the miles that lie between the quiet of theoretical condemnation in this Court and the pressures of realistic problems in the administrative agency, can explain this Court's readiness to insist that an unknown and unknowable solution be prescribed in advance. Solutions can be found, prescriptions can be written, to implement the Commission's determination that adequate interim protection must be furnished to the three roads. The Commission's insistence upon such protection is beyond dispute. Its deferral, in part, of the prescription of specific measures to effect this is at least understandable in light of the inherent difficulty of the problem. This is clear: (1) Appendix G, as I have noted, in effect invited the parties to work out their own agreement in substitution for the Commission's formula; (2) the Commission further demonstrated its awareness that only time and experience would perfect the interim conditions by its admonition to Penn-Central to comply not merely with the letter but with the spirit of the protective mandate; (3) the Commission, commendably, I suggest, ordered a hearing and reconsideration of the conditions after litigation commenced and the need therefor became apparent. The Commission, as I have noted, left in effect the traffic conditions, subject to modification, and provided that whatever indemnity provisions might be specified would be retroactive to the date of consummation of the merger. With the assurance that Penn-Central would accept whatever might be ordered in these respects,[7] it authorized consummation of the merger.

---

[7] The Commission did not, however, foreclose the applicants from seeking judicial review of any decision which might be made as to capital indemnification. 328 I. C. C., at 329.

470

The Court holds that this order approving immediate consummation of the merger is "insupportable," not because the Commission lacked power, but because the Commission deferred full implementation of its own findings that it was indispensable that interim protection be provided the three roads. The Court concedes that the Commission may retain jurisdiction for some pur- poses.[8] It does not "find it necessary to pass upon the question of naked power in the Commission to do what has been done here." Its drastic action is induced solely because of the Commission's decision to effect interim protection of the three roads—to which it and Penn- Central are fully committed—by prescribing only traffic conditions presently and to proceed with deliberation to work out the controversial and complex indemnifica- tion provisions. I agree with the Commission that, in view of the complete consent of the applicants to accept the terms ultimately fixed, there is no reason to defer the consummation of the merger until this is done. In any event, the choice of procedure that the Com- mission has made is not unreasonable; and this Court should not upset a decision of the magnitude involved in this merger except for significant reasons of substance.[9]

There is no reason of substance for the Court's action; there is no substantive value that is impaired or lost by proceeding as the Commission has ordered.

(1) As the Court found, there has been no objection to the substance of the traffic conditions which will con-

---

[8] See, e. g., United States v. Rock Island Motor Transit Co., 340 U. S. 419 (1951) (to keep motor routes of railroad "auxiliary or supplemental"); New York Central Unification, 154 I. C. C. 489 (1929) (inclusion of short lines); Chicago & N. W. Ry. Co. Merger, 261 I. C. C. 672 (1946) (employee protective provisions).

[9] "[I]n the absence of a clear legal prescription, a reasonable pro- cedural decision should withstand judicial interference." Jaffe, Judicial Control of Administrative Action 567 (1965).

tinue in effect, except suggestions as to details. Indemnification provisions will be made retroactive to the date of consummation of the merger and will therefore be as fully effective as if originally prescribed.

(2) Effective judicial review of the ultimate conditions will be available. If they fail in any respect fully and lawfully to implement the Commission's finding as to the necessity for interim protection of the three roads, they will presumably be modified. It is, with all respect, nonsense to say that the only remedy would be to "unscramble the consolidation." At issue are the indemnity terms. These are the only ones that have not been prescribed. They involve only the guaranty of payment of money on whatever formula the Commission may prescribe in its own motion or after direction by the courts. An order of the Commission or the courts to make such payment can be fully and easily implemented by conventional processes. The traffic conditions are to be effective immediately. They are not under substantial attack. If they are modified in this hearing, that is nothing more than an exercise of the power to modify its order which the Court concedes to be within the Commission's power under § 5 (9) of the Act. Cf. *United States* v. *Rock Island Motor Transit Co.,* 340 U. S. 419 (1951).

On the other hand, the Court's order, which I submit is insupportable as a matter of law and of sound administration of the principles of judicial review of decisions of administrative agencies, will have unfortunate consequences. I do not know, and I submit the Court cannot know, just how long it will take to satisfy the Court's rigid prescription that the interim protective provisions must be settled. The Court says that it will entail "a very short delay"; that the three roads will be included in the N & W or that the Commission's interim order

will be perfected with expedition. I view this prediction with profound skepticism. Too many interests have too much to gain from obstruction and delay; and the maze of administrative proceeding and judicial review is not inhospitable to ingenious counsel bent on delay. The history of ICC proceedings is a source book for dilatory tactics and a monument to the successful burial of good projects by over-elaborate procedures manipulated by experts in the art. Meanwhile, national policy continues unfulfilled; urgent national needs for improved long-haul and local rail service are impeded; the desperate erosion of the New Haven continues at a rapid pace; and the public and communities urgently in need of improved rail service continue to suffer.

If this result were compelled by law—if the Court's decision rested upon fault of substance—the practical consequence would have to be suffered with grace. But that is not so. The Commission insisted that the three smaller roads had to receive interim protection and required the applicants to agree to this as a condition of consummation of the merger. It has not modified this. It has not failed to implement it. On the contrary, it has—I think, commendably—embarked upon a procedure which, *while assuring that the protections will be forthcoming,* subject to judicial review, makes possible the careful and deliberate working-out of its terms and at the same time avoids disrupting the timetable of the merger. If we were to comment upon it, we should, I think, be compelled to applaud the unusual flexibility of method which it demonstrates and which has not always ornamented Commission practices. But we should not indulge in this kind of second-guessing. The plain conclusion is that the Commission's order does not vio-late any principle of law. It does not fail to implement the Commission's findings. It merely provides for the

accomplishment in stages of an objective firmly stated to which it and the applicants are fully committed. This is well within its powers, and we should affirm.

Addendum:

MR. JUSTICE BRENNAN's concurring opinion requires these additional comments. He concedes that "this merger may well be in the public interest," but he concludes that the Commission's order approving and authorizing consummation of the merger must be set aside because the Commission has not completed the job of providing for the future of the three roads: the E–L, D & H and B & M. MR. JUSTICE BRENNAN does not contend that, as an abstract matter, settlement of the ultimate destiny of these roads is a necessary precondition to approval of the Penn-Central merger. He recognizes that such a contention would be contrary to statute, precedent, and practical sense. The Commission clearly has power to reserve for the future some problems incident to a merger. Faced—as this Court is not—with the urgent need of coping with the realities of life, the Commission must frequently content itself with less than perfection. Accordingly, MR. JUSTICE BRENNAN agrees that "the Act vests wide discretion in the agency to allow a merger to go forward while conditions as to inclusion are worked out." He argues, however, that *in this specific situation,* the failure to settle, by definitive order, the ultimate fate of the three roads is error which requires that the order approving the Penn-Central merger be set aside. In my judgment, his analysis lays bare the tortuous speculation upon which the Court's nullification of this merger is based.

MR. JUSTICE BRENNAN's argument, in net effect, is that when the Commission really comes to grips with the problem of including the roads in one of the great sys-

tems, one thing will lead to another and the eventual result will be that the Penn-Central merger—to which he does not otherwise object—will become contrary to the public interest. When the Commission reaches this point, it will either have to refrain from including the three roads in either the N & W or the Penn-Central systems, which would be contrary to its findings, or it will have to grit its teeth and go ahead even though inclusion of the three roads in one of the systems would make the Penn-Central merger contrary to the public interest. I agree that either of these would be most unfortunate. My difficulty stems from the fact that there is no basis for the forecast of catastrophe. With all respect, my Brother BRENNAN's journey from the present to this horrifying future requires a trip through outer space which I cannot make, and in which I do not believe we should indulge. There should be more than rocketry to justify our nullification of action of this national importance which has been authorized by the agency with the heavy responsibility for repairing our deplorable national railroad network.

MR. JUSTICE BRENNAN says that "[a]llegations are made" by the Department of Justice and numerous other parties that inclusion of the three roads in either of the major systems "might not be possible consistent with the public interest or upon equitable terms." Now the fact that allegations are made is interesting, but less than dispositive; so MR. JUSTICE BRENNAN, after pointing out that there seems to be general agreement that the three roads should be included in the N & W, says that "there is a significant possibility, given the present state of circumstances, that inclusion in N & W might be unattainable or attainable only at the price of rendering the Penn-Central merger against the public interest, and that, even if inclusion could be accomplished consistent

with the public interest, it might be impossible to work out equitable terms."

Now, a "significant possibility" is not, I think, a conventional basis for judicial nullification of an administrative order. See *Illinois C. R. Co.* v. *Norfolk & W. R. Co.*, 385 U. S. 57, 69 (1966), and cases there cited. It is true, as MR. JUSTICE BRENNAN argues, that there are problems and difficulties about inclusion of the roads in one of the systems, largely stemming from the poor financial condition of two of the three roads. These difficulties themselves argue for prompt inclusion of the roads in one of the great systems, a result which the three roads' fierce struggle for the last ounce of flesh may paradoxically defeat.[10] But judicial pessimism, if it is to lead to administrative nullification, should have a more substantial basis than is present here. There is, in fact, no basis here for assuming that the roads will not be included in the N & W; or that the terms and conditions will not be equitable; or that the result will make the Penn-Central merger contrary to the public interest—or that, if any of these happened at the Commission's hands, corrective measures could not be mandated by the courts.

The N & W, as MR. JUSTICE BRENNAN recognizes, has "irrevocably agreed to include these three petitioners in their system upon terms . . . , if necessary, prescribed by [the Commission], provided such inclusion is found to be consistent with the public interest." 327 I. C. C., at 529. There is no reason for us to doubt that the Commission will in fact complete the task of working out terms and conditions of inclusion. If deemed neces-

---

[10] Judge Friendly referred to "the jockeying of these roads and of the three plaintiffs in the C & O, B & O, and N & W actions for price and position in respect of other mergers—which, despite all the words, is what we suspect these actions to be mostly about." 259 F. Supp., at 981.

sary, we could order that the District Court retain jurisdiction so that the courts could speedily accomplish the result if the Commission should fail.

But MR. JUSTICE BRENNAN darkly argues that the pressure of the problem of including the three roads will result in creating a "virtual rail monopoly in some southeastern States." He attaches a map to prove it. This will come about, he says, because when the Commission really gets down to the inclusion of these three roads in the N & W, the financial burdens will irresistibly impel the Commission to allow the N & W and C & O to affiliate, with monopolistic effect, in order to bear the weight of the included roads. The net result, therefore, he argues, is "that Penn-Central will increase the likelihood of, and may actually cause, an affiliation of N & W and C & O." He points out that the Commission did not consider this possibility. That's true. But the remoteness of the consequence that MR. JUSTICE BRENNAN divulges is such that neither we nor the Commission can, in all reason, be required to consider it. I respectfully disagree with my Brother BRENNAN that "Only by considering this possibility could the ICC fulfill its obligation to consider all the relevant factors before approving the merger." I do not believe that we can require of the Commission the rich and resourceful imagination to foresee the consequence that the relatively minor problem presented by the three roads will precipitate a vast monopoly, nor, if the Commissioners were so gifted as to envisage such a result, could we expect a response from them as to the problem presented other than a solemn oath that they will not build a city to house a mouse. In any event, if they yielded virtue and judgment in response to the urgencies of these three roads, the courts could always overrule them.[11] That the courts would

---

[11] I do not intend to indicate any opinion as to the merits of a possible N & W–C & O affiliation.

not be timid, reluctant, or deferential to intervene in the Commission's decision is a proposition which today's decision establishes beyond dispute.

I repeat: Given the point conceded by my Brother BRENNAN that the Commission has power to permit the merger to go forward while the problems incident to inclusion of these three roads in one of the great systems are being worked out, there is no basis for repudiating the exercise of that power in this case.

It is not necessary to analyze MR. JUSTICE BRENNAN's detailed attack upon the Commission's interim protective conditions for the three roads. These are being reconsidered by the Commission, and are hardly ripe for judicial review. The underlying question is, again, whether the Commission may allow the "merger to go forward while conditions . . . are worked out." MR. JUSTICE BRENNAN contends that "the Act vests wide discretion in the agency" to do this, and I confess bafflement as to why this discretion is not broad enough to require us to tolerate the Commission's action here.

The basic fact of the matter, I submit, is that this is not a case in which the Commission has refused or failed to consider, or to make findings or provide for effective measures with respect to a material aspect of a merger. It gave elaborate, meticulous consideration to the problem presented by the three roads. It made findings with respect to their needs which apparently evoked an enthusiastic response—perhaps excessively enthusiastic—in this Court. It worked out provisions for assuring the interim protection of the roads and their eventual destiny. It made clear, effective provision for accomplishing the result found necessary: that the three roads ultimately be included in one of the major systems and that meanwhile they receive traffic and financial protection and benefits. It did this by requiring advance consent and reserving jurisdiction. The integrity and

adequacy of the process may be subjected to court review.

I cannot escape the conclusion that the dimensions of this merger have induced a major departure from the established and sound principles governing judicial review of administrative judgments in complex economic situations. It is, of course, possible, perhaps probable, that the parties affected by this merger, including the three roads, aided by the shock of the Court's action herein, will find a way to avert the national mischief of aborting the Penn-Central merger and of avoiding the continuation of the deplorable condition of two of the three roads which will persist if the Penn-Central merger is not effectuated. But I think, with all respect, that the Court's decision in this case is wrong in principle and unfortunate in consequence. It is a reversion to the days of judicial negation of governmental action in the economic sphere. We should be conservative and restrained, I think, where all we can say is *no*. The problems of the administrative agency deserve more understanding and its efforts to find solutions are entitled to more respect than the Court has today shown. The courts may be the principal guardians of the liberties of the people. They are not the chief administrators of its economic destiny.